**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SPIKE BODY WERKS, INC., an Illinois )
Corporation GENEVA REPAIR SHOP INC., an )
Illinois Corporation, NICNAT LLC, an Illinois )
Limited Liability Company, and PASQUALE )
ROPPO, an individual, )
           )
           Plaintiffs, )
           )
      v. )      Case No.
           )
BYLINE BANKCORP, INC., and its primary )
subsidiary, BYLINE BANK, as successor in interest )
to Ridgestone Bank, its successors and assigns, )
           )
           Defendants. )

## COMPLAINT

Plaintiffs, SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR

SHOP INC., an Illinois Corporation, NICNAT LLC, an Illinois Limited Liability Company, and

PASQUALE ROPPO, an individual, by and through their attorney, Nicholas R. Recchia, and

complaining against Defendants, BYLINE BANKCORP, INC., and its primary subsidiary,

BYLINE BANK, as successor in interest to Ridgestone Bank, its successors and assigns, states as

follows:

## INTRODUCTION

1.      Plaintiffs SPIKE BODY WERKS, INC., an Illinois Corporation ("SPIKE")

GENEVA REPAIR SHOP INC., an Illinois Corporation, ("GENEVA") NICNAT LLC, an

Illinois Limited Liability Company, ("NICNAT") and PASQUALE ROPPO, an individual

("ROPPO") (hereinafter collectively "Plaintiffs") bring this action against BYLINE BANK,

("BYLINE") for discriminating against Plaintiffs (and more specifically ROPPO, an Italian-

American immigrant) in its commercial mortgage lending. The action to enforce the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691 (ECOA), is brought to redress discrimination based on race and national origin that BYLINE engaged in against Plaintiffs (and more specifically, ROPPO, an Italian-American immigrant). Plaintiffs further seek relief and damages for breach of contract, fraudulent concealment and fraudulent misrepresentation.

2.      BYLINE originated certain small business loans for Plaintiffs.

3.      As a result of BYLINE's policies and practices, Plaintiffs paid BYLINE higher loan fees and costs for their commercial mortgage, not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race or national origin.

4.      Furthermore, as a direct and proximate result of BYLINE's practices and policies, ROPPO was coerced into signing certain loan documents and taken advantage of based upon his race and national origin.

5.      Plaintiffs bring this lawsuit to hold BYLINE accountable for its egregious violations of law and remedy the substantial and widespread harmful consequences of BYLINE's discriminatory lending policies and practices.

6.      This Honorable Court has jurisdiction over this action pursuant to 15 U.S.C. § 1691e(h). Venue is appropriate pursuant to 28 U.S.C. § 1391.

7.      BYLINE is a Delaware corporation and the holding company for BYLINE BANK(s). It is the fourth (4th) largest small business administration lender and is headquartered with its principal place of business in Chicago, Illinois.

8.      BYLINE is subject to Federal laws prohibiting lending discrimination, including the ECOA and the regulations promulgated under those laws. The ECOA prohibits lenders from discriminating on the basis of, inter alia, race or national origin in their lending practices.

## FACTUAL ALLEGATIONS

1-8.    Plaintiff's restate and reallege their allegations contained in paragraphs 1–8 as though fully alleged as paragraphs 1-7 of this section entitled Factual Allegations.

9.    Between February, 2017 and December, 2017, after nearly ten (10) months of negotiation, Plaintiffs closed on certain small business loans (the SBA loans) with BYLINE. True and correct copies of the relevant loan documents are attached hereto and made part hereof as Exhibit A.

10.    At the onset of the relationship between ROPPO and BYLINE, ROPPO met with BYLINE's representatives, including, without limitation, Thomas Lyons and Eliana Metropolis, and verbally discussed his background with them, giving specific facts of his immigration to the United States from Italy on December 13, 2003, of his starting his own business on April 1, 2010, and of Italian being his first language.

11.    BYLINE, an institution engrained with a superior knowledge for banking, mortgages and lending, was well aware of ROPPO's race, national origin, and language barrier during the course of its negotiations with ROPPO and took advantage of his deficiencies.

12.    During the application process and throughout the ten (10) months of negotiations with BYLINE, Plaintiffs, both verbally and in writing, expressed its concerns to BYLINE that a line of credit was a condition precedent for Plaintiffs to close on the loans.

13.    In fact, Plaintiffs made BYLINE abundantly aware that such line of credit would be the only way in which Plaintiffs would be able to sustain its day-to-day operations and survive as a body shop.

14.    Plaintiffs were also very concerned about BYLINE's tactics in obtaining it's [over] collateralization of the loan.

15. Specifically, ROPPO, on numerous occasions, specifically questioned BYLINE's representatives, and in particular Thomas Lyons, in that everything he owned, a personal guaranty, and everything "including his first born" was being used as collateral and that "there was not enough to close the loan and issue a line of credit".

16. However, to ROPPO's great detriment, BYLINE, through Lyons, reassured ROPPO time and time again that everything would be "okay". Specifically, Lyons states to ROPPO that they were "going to take care of each other" and "not to worry because BYLINE was very familiar with the body shop industry" and that he was "kind of a big deal in the SBA world" and that he was going to "make the numbers work to close the loan".

17. In fact, during the negotiation process, BYLINE assured Plaintiffs, both verbally and in writing, that it would either issue a line of credit or release some collateral upon Plaintiffs remaining in good standing on the loan for several months following closing on December 29, 2017.

18. For the period of twelve (12) consecutive months following closing, Plaintiffs made timely loan payments and remained in good standing on all terms of the loans with BYLINE.

19. During the course of the twelve (12) month period, Plaintiffs would inquire periodically of BYLINE as to the line of credit they were promised as a condition precedent to signing the loan documents, yet each time Plaintiffs would inquire, BYLINE refused to issue said line of credit.

20. From December 2017 through December 2018, due to BYLINE's failure to issue the line of credit, Plaintiffs could not even schedule vehicles for repair, despite having the

continued business coming in, because Plaintiffs did not have the line of credit available to purchase necessary parts for the vehicles.

21.     In the beginning of 2019, Plaintiffs sought assistance from BYLINE's SBA loan assistance program, and specifically through its employee, Greg Andrews.

22.     During the course of that negotiation, BYLINE allowed Plaintiffs an initial forbearance on the loans but only contingent upon Plaintiff ROPPO executing certain documentation.

23.     Plaintiff ROPPO, requested that BYLINE send any and all documentation to his attorneys prior to execution, however BYLINE never complied with those requests.

24.     To the contrary, on or about June 14, 2019, Greg Andrews, unbeknownst to Plaintiffs, personally showed up to Plaintiff's place of business unannounced and demanded that ROPPO sign the forbearance documents right there "on the spot" or BYLINE would default Plaintiffs.

25.     On said date and time, BYLINE, through its agent Greg Andrews, coerced, and otherwise deceptively induced ROPPO into signing what he called a "Pocket Deal" (i.e. Deed in Lieu of Foreclosure) to avoid a default.

26.     Specifically, on said date and time, BYLINE, through its agent Greg Andrews, threatened ROPPO and stated that if he did not sign the Deed immediately while Greg Andrews was present at ROPPO's shop, that BYLINE would immediately default Plaintiffs, and "take away everything" that ROPPO had worked so hard to build.

27.     On said date and time, ROPPO, on numerous occasions, specifically requested that Greg Andrews allow ROPPO to confer with his attorney prior to signing the Deed, however, was declined the opportunity.

28.     ROPPO had no knowledge as to what he was signing, never received copies of the document(s) he signed, and was never given an opportunity to have his attorney review any of the documents prior to signing, despite his pleas with BYLINE to do so. In fact, as of the date of this filing, Plaintiffs have never received a copy of the Deed.

29.     It was later discovered that BYLINE had also charged Plaintiffs higher fees and costs not based on their creditworthiness or other objective criteria related to borrower risk, but because of their race, and for better lack of word, "ignorance" as to terms and conditions due to language barrier.

30.     It was BYLINE's business practice to allow its employees who originated commercial loans through its retail channel to vary a loan's interest rate and other fees from the price initially set based on a borrower's objective credit-related factors. This subjective and unguided pricing discretion resulted in Plaintiffs paying more not based on borrower risk.

31.     As a result of BYLINE's discriminatory retail pricing practices, Plaintiffs paid significantly more for their loan and were significantly overleveraged and overcollateralized.

32.     BYLINE's commercial retail pricing monitoring efforts, were inadequate to remedy discriminatory practice and were more than sufficient to put it on notice of widespread pricing disparities based on race.

33.     Even when BYLINE had reason to know there were disparities, however, BYLINE did not act to determine the full scope of these retail pricing disparities, nor did it take prompt and effective action to eliminate these disparities.

34.     BYLINE had knowledge that the subjective and unguided discretion it granted to mortgage loan officers in its retail mortgage loan pricing policies and practices was being

exercised in a manner that discriminated against Plaintiff ROPPO, and Italian immigrant borrowers, but it continued to implement its policies and practices with that knowledge.

35.     BYLINE did not take effective action to change the pricing adjustment policies or practices to fully eliminate their discriminatory impact, nor did it change its compensation policy to discourage the charging of overages.

36.     Based upon the foregoing, Plaintiffs subsequently filed an SBA Complaint with the SBA Fraud Department against BYLINE. A true and correct copy of the SBA Complaint and proof of submission are attached hereto and made part hereof as Exhibit B.

## COUNT I: EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS

1-36.   Plaintiff's restate and reallege their allegations contained in paragraphs 1-36 as though fully alleged as paragraphs 1-36 of this Count I.

37.     BYLINE's commercial lending-related policies and practices and the policies and practices it followed in this commercial credit transaction as alleged herein constitutes discrimination against applicants with respect to credit transactions on the basis of race and national origin in violation of the Equal Credit Opportunity Act. 15 U.S.C. § 1691(a)(1).

38. BYLINE's commercial lending-related policies and practices as alleged herein constitute a pattern or practice of resistance to the full enjoyment of rights secured by the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691 f; and a denial of rights granted by Plaintiffs (and specifically rights granted to ROPPO, an Italian-American immigrant) that raises an issue of general public importance.

39.     In addition to the direct economic costs, ROPPO, the victim of discrimination herein, suffered additional consequential economic damages resulting from having an excessively costly loan, including increased risk of credit problems, and other damages, including

emotional distress. He is an aggrieved applicant as defined in the Equal Credit Opportunity Act, 15 U.S.C. § 1691e, and has suffered irreparable harm and substantial injury and damages as a result of BYLINE's conduct.

40.     BYLINE's policies and practices, as described herein, were intentional, willful, or implemented with reckless disregard for the rights of ROPPO, an Italian immigrant borrower, with limited general banking knowledge, and a language barrier.

WHEREFORE, Plaintiffs SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR SHOP INC., an Illinois Corporation, NICNAT LLC, an Illinois Limited Liability Company, and PASQUALE ROPPO, an individual, pray this Honorable Court enter an Order:

A.     Declaring that the policies and practices of Defendant constitute violations of the Equal Credit Opportunity Act, 15 U.S.C. 1691(f);

B.     Award monetary damages to Plaintiffs for the Defendant's discriminatory policies and practices for the injuries caused by the Defendant, including direct economic damages, consequential economic damages, and other damages pursuant to 15 U.S.C. 1691e(h).

C.     And for such other relief as this Court deems proper and just.

## COUNT II: BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH

1-36.   Plaintiff's restate and reallege their allegations contained in paragraphs 1-36 as though fully alleged as paragraphs 1-36 of this Count II.

37.     On or about December 11, 2017, Plaintiffs and Defendant executed certain documents to consummate a loan agreement by and between the Parties.

8

38.     In Illinois, every contract is subject to an implied covenant known as a covenant of good faith and fair dealing.

39.     From the inception of the deal between BYLINE and Plaintiffs, BYLINE was not acting in good faith, was not acting with reasonable expectations and was acting with improper motive (i.e. acting fraudulently to induce Plaintiffs to enter into loan agreements by falsely promising them a line of credit and release of certain collateral).

40.     Further, BYLINE did not give Plaintiffs an adequate opportunity to obtain reasonable alternative financing prior to terminating their loans with Plaintiffs.

41.     In fact, BYLINE refused to agree with Plaintiffs on the terms of a certain loan forbearance agreement, despite Plaintiffs willingness to make good faith payments toward any arrearage at a time during the COVID-19 pandemic and whilst Plaintiffs was forced to lay off approximately ninety percent (90%) of its work force.

42.     As a direct and proximate result of BYLINE's breaches, Plaintiffs have suffered irreparable harm and economic damages.

43.     In January 2020, Plaintiffs became CARSTAR certified. CARSTAR is North America's largest Multi-Shop Operator Network of independently owned collision repair facilities, offering auto body repair, paintless dent repair, storm damage repair with 24/7 accident assistance.

44.     According to CARSTAR projections, the "slowdown" in production and business caused Plaintiffs a loss of business of approximately Three Hundred Thousand and 00/100 Dollars ($300,000.00).

45.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2019 was Five Hundred Thousand and 00/100 Dollars ($500,000.00).

46.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2020 to date is Seven Hundred Thousand and 00/100 Dollars ($700,000.00).

47.     From 2018 to present, Plaintiffs further suffered "loss of business accounts" (former, current and future accounts) of approximately Two Million and 00/100 Dollars ($2,000,000.00).

48.     Also, from 2018 to present, Plaintiff ROPPO was forced to take out-of-pocket monies and put those monies back into the business to keep the business going. That out-of-pocket amount totals approximately Five Hundred Thousand and 00/100 Dollars ($500,000.00).

49.     Plaintiffs were further forced to take out a high interest loans of approximately One Million and 00/100 Dollars ($1,000,000.00) to "keep the business going".

50.     Finally, Plaintiffs, and in particular ROPPO, have suffered severe emotional distress, as a direct and proximate result of BYLINE's fraud(s) and seek Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in pain and suffering.

WHEREFORE, Plaintiffs, SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR SHOP INC., an Illinois Corporation, NICNAT LLC, an Illinois Limited Liability Company, and PASQUALE ROPPO, an individual, pray for entry of judgment in their favor and against Defendants, in the amount of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) together with costs of suit and attorneys' fees.

## COUNT III: FRAUDULENT INDUCEMENT

1-36.     Plaintiff's restate and reallege their allegations contained in paragraphs 1-36 as though fully alleged as paragraphs 1-36 of this Count II.

37.     BYLINE's statements to Plaintiffs, and specifically to ROPPO, were that of material fact, namely the statements made promising a line of credit to ROPPO so long as Plaintiffs remained in good standing on their loans for a period of time certain.

38.     Those statements made by BYLINE were not only statements of material fact, but were false statements of material fact, since BYLINE never fulfilled their promise and contractual obligation of a line of credit to Plaintiffs.

39.     BYLINE knew, or should have known, from loan origination, that they were never going to comply with such a promise to Plaintiffs and that the sole purpose of such a promise was to induce Plaintiff to enter into the loan agreements they did with BYLINE.

40.     Plaintiffs detrimentally relied upon the truth of the representations being made by BYLINE.

41.     As a direct and proximate result of BYLINE's failure to provide a line of credit, as promised, guaranteed and represented, Plaintiffs suffered irreparable harm and economic damages.

42.     In January 2020, Plaintiffs became CARSTAR certified. CARSTAR is North America's largest Multi-Shop Operator Network of independently owned collision repair facilities, offering auto body repair, paintless dent repair, storm damage repair with 24/7 accident assistance.

43.     According to CARSTAR projections, the "slowdown" in production and business caused Plaintiffs a loss of business of approximately Three Hundred Thousand and 00/100 Dollars ($300,000.00).

44.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2019 was Five Hundred Thousand and 00/100 Dollars ($500,000.00).

45.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2020 to date is Seven Hundred Thousand and 00/100 Dollars ($700,000.00).

46.     From 2018 to present, Plaintiffs further suffered "loss of business accounts" (former, current and future accounts) of approximately Two Million and 00/100 Dollars ($2,000,000.00).

47.     Also, from 2018 to present, Plaintiff ROPPO was forced to take out-of-pocket monies and put those monies back into the business to "keep the business going". That out-of-pocket amount totals approximately Five Hundred Thousand and 00/100 Dollars ($500,000.00).

48.     Plaintiffs were further forced to take out a high interest loans of approximately One Million and 00/100 Dollars ($1,000,000.00) to "keep the business going".

49.     Finally, Plaintiffs, and in particular ROPPO, have suffered severe emotional distress, as a direct and proximate result of BYLINE's fraud(s) and seek Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in pain and suffering.

WHEREFORE, Plaintiffs, SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR SHOP INC., an Illinois Corporation, NICNAT LLC, an Illinois Limited Liability Company, and PASQUALE ROPPO, an individual, pray for entry of judgment in their favor and against Defendants, in the amount of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) together with costs of suit and attorneys' fees.

## COUNT IV: FRAUDULENT CONCEALMENT AND FRAUDULENT MISREPRESENTATION

1-36.   Plaintiff's restate and reallege their allegations contained in paragraphs 1-36 as though fully alleged as paragraphs 1-36 of this Count II.

37.     BYLINE's omissions to Plaintiffs, and their concealing material facts, namely that they were never going to issue a line of credit or release collateral despite Plaintiff' remaining in good standing, created a false belief of Plaintiffs that they were going to obtain such line of credit.

38.     Plaintiffs had no way of discovering that BYLINE was never going to give them a line of credit, through reasonable and diligent inquiry.

39.     Plaintiffs detrimentally relied upon the truth of the representations being made by BYLINE.

40.     From loan origination, had BYLINE indicated they would not be giving a line of credit to Plaintiffs, Plaintiffs would have never entered into the loans they did because they knew and made it apparent to BYLINE that such line of credit was tantamount to the success of their business.

41.     As a direct and proximate result of BYLINE's failure to provide a line of credit, as promised, guaranteed and represented, Plaintiffs suffered irreparable harm and economic damages.

42.     In January 2020, Plaintiffs became CARSTAR certified. CARSTAR is North America's largest Multi-Shop Operator Network of independently owned collision repair facilities, offering auto body repair, paintless dent repair, storm damage repair with 24/7 accident assistance.

43.     According to CARSTAR projections, the "slowdown" in production and business caused Plaintiffs a loss of business of approximately Three Hundred Thousand and 00/100 Dollars ($300,000.00).

44.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2019 was Five Hundred Thousand and 00/100 Dollars ($500,000.00).

45.     According to those same CARSTAR projections, the loss of business for Plaintiffs in year 2020 to date is Seven Hundred Thousand and 00/100 Dollars ($700,000.00).

46.     From 2018 to present, Plaintiffs further suffered "loss of business accounts" (former, current and future accounts) of approximately Two Million and 00/100 Dollars ($2,000,000.00).

47.     Also, from 2018 to present, Plaintiff ROPPO was forced to take out-of-pocket monies and put those monies back into the business to "keep the business going". That out-of-pocket amount totals approximately Five Hundred Thousand and 00/100 Dollars ($500,000.00).

48.     Plaintiffs were further forced to take out a high interest loans of approximately One Million and 00/100 Dollars ($1,000,000.00) to "keep the business going".

49.     Finally, Plaintiffs, and in particular ROPPO, have suffered severe emotional distress, as a direct and proximate result of BYLINE's fraud(s) and seek Two Million Five Hundred Thousand and 00/100 Dollars ($2,500,000.00) in pain and suffering.

WHEREFORE, Plaintiffs, SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR SHOP INC., an Illinois Corporation, NICNAT LLC, an Illinois Limited Liability Company, and PASQUALE ROPPO, an individual, pray for entry of judgment in their favor and against Defendants, in the amount of Seven Million Five Hundred Thousand and 00/100 Dollars ($7,500,000.00) together with costs of suit and attorneys' fees.

Respectfully submitted,

SPIKE BODY WERKS, INC., an Illinois Corporation GENEVA REPAIR SHOP INC., an Illinois Corporation, NICNAT

14

LLC, an Illinois Limited Liability Company,
and PASQUALE ROPPO, an individual

By: *Nicholas R. Recchia*
                  One of their attorneys

Nicholas R. Recchia
Attorney At Law
1701 E. Woodfield Road, Suite 925
Schaumburg, Illinois 60173
(847) 619-3000
recchialaw@aol.com
ARDC No. 6309973

EXHIBIT A



**LOAN AGREEMENT**

by and between

**SPIKE BODY WERKS, INC.,**

**GENEVA REPAIR SHOP INC.**

and

**BYLINE BANK**

**DATED AS OF _____, 2017**

*$324,000 SBA 7(a) Loan*
*(SBA Loan No. 16554170-05)*

## LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") is dated as of _____, 2017, by and between SPIKE BODY WERKS, INC., an Illinois corporation ("Spike"), GENEVA REPAIR SHOP INC., an Illinois corporation ("Geneva"), and BYLINE BANK, an Illinois banking corporation (together with its successors and assigns, "Lender"). Spike and Geneva are sometimes referred to herein individually as a "Borrower," and collectively as the "Borrowers."

## RECITALS

A.     Borrowers have requested that Lender provide Borrowers with a loan in the principal amount of $324,000 (the "Loan") under the United States Small Business Administration ("SBA") 7(a) loan program.

B.     Lender is willing to provide Borrowers with the Loan pursuant to the terms of the Authorization (SBA 7(a) Guaranteed Loan) SBA Loan No. 16554170-05, approved by the SBA on December 11, 2017 (the "SBA Authorization"), provided that, among other things, Borrowers execute and deliver this Agreement.

NOW, THEREFORE, in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

When used in this Agreement, the capitalized terms set forth in this Article 1 shall have the meanings specified. The singular use of any defined term includes the plural and the plural use includes the singular.

1.1.    "Account Debtor" shall mean, collectively, each Person: (a) to or for whom Borrowers have provided or has agreed to provide any goods or services; or (b) which owes Borrowers any sum of money as a result of goods sold or services provided by Borrowers; or (c) which is the maker or endorser on any Instrument payable to Borrowers or otherwise owes any Borrower any sum of money on account of any loan or other payment obligation. With respect to each Receivable which is payable by any governmental authority, "Account Debtor" includes, without limitation, the agency, instrumentality or official which has the duty of remitting or causing the remittance of the amounts owing on such Account or other Receivables.

1.2.    "Accounts," "Chattel Paper," "Deposit Accounts," "Documents," "Equipment," "General Intangibles," "Goods," "Instruments," "Inventory," "Investment Property" and "Letter of Credit Rights" shall have the same respective meanings as are given to those terms in the UCC. "Fixtures" shall have the meaning provided by the common law of the state in which the fixtures are located.

1.3.    "Affiliate" shall mean collectively any Person: (a) that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with any Borrower, including, without limitation, the officers, managers and directors of any Borrower; (b) that directly or beneficially owns or holds ten percent (10%) or more of any Capital Securities in any Borrower; or (c) ten percent (10%) or more of whose Capital Securities are owned directly or controlled by any Borrower. As used herein, the term "control" (including, with correlative meanings, the terms "controlled by" and "under common control with") shall mean possession, directly or indirectly, of the power to direct the

1

management or policies of a Person, whether through ownership of Capital Securities, by contract or otherwise.

1.4. "Agreement" shall have the meaning set forth in the introductory paragraph of this Agreement.

1.5. "Borrower" and "Borrowers" shall have the meaning set forth in the introductory paragraph of this Agreement.

1.6. "Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banking institutions in the State of Wisconsin are required to be closed.

1.7. "Capital Lease" shall mean a lease with respect to which the lessee's obligations thereunder should, in accordance with GAAP, be capitalized and reflected as a liability on the balance sheet of the lessee.

1.8. "Capital Lease Obligations" shall mean any Indebtedness incurred as a lessee pursuant to a Capital Lease.

1.9. "Capital Securities" shall mean, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued or acquired after the Closing Date, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership, interests in a trust, interests in other unincorporated organizations or any other equivalent of such ownership interest.

1.10. "Closing" shall mean the full execution and delivery of this Agreement, the Note, and all other Loan Documents.

1.11. "Closing Date" shall mean _____, 2017.

1.12. "Code" shall mean the Internal Revenue Code of 1986, as amended, and all Treasury regulations, revenue rulings, revenue procedures or announcements issued thereunder.

1.13. "Collateral" shall mean all of the tangible and intangible assets, property rights, and benefits wherever located, whether now owned or hereafter acquired, whether real or personal property, together with all substitutions therefore, and all replacements and renewals thereof, and all accessions, additions, replacement parts, manuals, warranties and packaging relating thereto, with respect to which any Borrower, any Guarantor, or any other Person has granted a security interest or lien to Lender pursuant to the Loan Documents including, but not limited to, all of the following tangible and intangible assets and property rights of any Borrower, whether real or personal property: Accounts; Chattel Paper; Deposit Accounts; Documents; Equipment; Fixtures; General Intangibles; Goods; Instruments; Inventory; Investment Property; Letter of Credit Rights; Receivables; and all Records relating to or pertaining to any of the above listed Collateral.

1.14. "Contaminant" shall mean any hazardous substance, hazardous waste, petroleum products, or any other pollutant regulated by any Law as hazardous to the environment.

1.15. "Corporate Guarantor" shall mean Nicnat LLC, an Illinois limited liability company.

1.16. "Default" shall mean any event, occurrence or omission which, with the giving of notice,

2

the passage of time, or both, would constitute an Event of Default.

1.17.    "Employee Benefit Plan" shall mean an "employee benefit plan" as defined in Section 3(3) of ERISA.

1.18.    "Environmental Laws" shall mean any Laws pertaining to reporting or clean-up of any Contaminant.

1.19.    "ERISA" shall mean the Employee Retirement Income Security Act of 1974 and regulations issued thereunder, as amended from time to time and any successor statute.

1.20.    "ERISA Affiliate" shall mean, in relation to any Person, any trade or business (whether or not incorporated) which is a member of a group of which that Person is a member and which is under common control within the meaning of the regulations promulgated under Section 414 of the Code.

1.21.    "ERISA Liabilities" shall mean the aggregate of all unfunded vested benefits under any employee pension benefit plan, within the meaning of Section 3(2) of ERISA, of any Borrower or any ERISA Affiliate of any Borrower under any plan covered by ERISA that is not a Multiemployer Plan and all potential withdrawal liabilities of any Borrower or any ERISA Affiliate under all Multiemployer Plans.

1.22.    "Event of Default" shall mean any of the events set forth in Article 5 of this Agreement.

1.23.    "Fiscal Month," "Fiscal Quarter," and "Fiscal Year" mean Borrowers' fiscal months, quarters, or years, as applicable.

1.24.    "GAAP" shall mean, with respect to any date of determination, generally accepted accounting principles as used by the Financial Accounting Standards Board and/or the American Institute of Certified Public Accountants consistently applied and maintained throughout the periods indicated.

1.25.    "Guarantee" shall mean each guarantee executed from time to time by any Guarantor for the benefit of Lender, and "Guarantees" shall mean all of them, collectively.

1.26.    "Guarantee Indebtedness" shall mean any obligation, contingent or otherwise, of any referenced Person directly or indirectly guaranteeing any debt or obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person: (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such debt or obligation (whether arising by virtue of partnership arrangements, by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise, other than agreements to purchase goods at an arm's length price in the ordinary course of business); or (b) entered into for the purpose of assuring in any other manner the holder of such debt or obligation of the payment thereof or to protect such holder against loss in respect thereof (in whole or in part). The term "Guarantee Indebtedness" shall not include endorsements for collection or deposit in the ordinary course of business.

1.27.    "Guaranteed Pension Plan" shall mean any pension plan maintained by any Borrower or an ERISA Affiliate of any Borrower, or to which any Borrower or any ERISA Affiliate contributes, some or all of the benefits under which are guaranteed by the United States Pension Benefit Guarantee Corporation.

1.28.    "Guarantor" shall mean the Corporate Guarantor, the Individual Guarantor and any other Person who may guarantee the Obligations of any Borrower from time to time, and "Guarantors" shall mean all of them, collectively.

1.29.    "Indebtedness" shall mean, as to any referenced Person (determined without duplication): (a) indebtedness of such Person for borrowed money (whether by loan or the issuance and sale of debt securities), or for the deferred purchase or acquisition price of property or services (other than accounts payable incurred in the ordinary course of business); (b) obligations of such Person in respect of letters of credit or similar instruments issued or accepted by financial institutions for the account of such Person (whether or not such obligations are contingent); (c) Capital Lease Obligations of such Person; (d) obligations of such Person to redeem or otherwise retire Capital Securities in such Person; (e) indebtedness of others of the type described in clause (a), (b), (c) or (d) above secured by a lien on any of the property of such Person, whether or not the respective obligation so secured has been assumed by such Person; and (f) Guarantee Indebtedness.

1.30.    "Individual Guarantor" shall mean Pasquale Roppo.

1.31.    "Insolvency Proceedings" shall mean, with respect to any Person, any case or proceeding commenced by or against such Person, under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, or any assignments for the benefit of creditors, formal or informal moratoriums, compositions or extensions with some or all creditors with respect to any Indebtedness of such Person.

1.32.    "Laws" shall mean all federal, state, local or other laws, rules, regulations or governmental requirements of any kind, and the rules, regulations, written interpretations and orders promulgated thereunder.

1.33.    "Lender" shall have the meaning set forth in the introductory paragraph of this Agreement.

1.34.    "Lender Expenses" shall mean the out-of-pocket expenses or costs incurred by Lender arising out of, pertaining to, or in any way connected with this Agreement, any of the other Loan Documents or the Obligations, or any documents executed in connection herewith or transactions hereunder. The term "Lender Expenses" shall include, without limitation (a) the costs or expenses required to be paid by Borrowers pursuant to this Agreement or any of the Loan Documents, (b) taxes and insurance premiums advanced or otherwise paid by Lender in connection with the Collateral or on behalf of Borrowers, (c) filing, recording, title insurance, environmental and consulting fees, audit fees, search fees and other expenses paid or incurred by Lender in connection with Lender's transactions with Borrowers, (d) costs and expenses incurred by Lender in the collection of the Accounts (with or without the institution of legal action), or to enforce any provision of this Agreement, or in gaining possession of, maintaining, handling, evaluating, preserving, storing, shipping, selling, preparing for sale and/or advertising to sell the Collateral  or any other property of Borrowers whether or not a sale is consummated, (e) costs and expenses of litigation incurred by Lender, or any participant of Lender in any of the Obligations, in enforcing or defending this Agreement or any portion hereof or in collecting any of the Obligations, (f) reasonable attorneys' fees and expenses incurred by Lender in obtaining advice or the services of its attorneys with respect to the structuring, drafting, negotiating, reviewing, amending, terminating, enforcing or defending of this Agreement, or any portion hereof or any agreement or matter related hereto, whether or not litigation is instituted, (g) travel expenses related to any of the foregoing, and (h) and expenses incurred by Lender in connection with annual site visits to Borrowers' place or places of business.

4

1.35.    "Life Insurance Policy" shall have the meaning set forth in Section 3.2(h) of this Agreement.

1.36.    "Loan" shall have the meaning set forth in Recital A of this Agreement.

1.37.    "Loan Documents" shall mean all agreements, instruments and documents, including without limitation, loan agreements, notes, guarantees, mortgages, deeds of trust, subordination agreements, intercreditor agreements, pledges, affidavits, powers of attorney, consents, assignments, landlord and mortgage waivers, opinions, collateral assignments, reimbursement agreements, security agreements, servicing agreements, notices, leases, subleases, financing statements, pledges and all other written matter, whether heretofore, now or hereafter executed by or on behalf of any Borrower or by any other Person in connection with the Obligations, including but not limited to this Agreement, and the SBA Authorization.

1.38.    "Material Adverse Event" shall mean the occurrence of any event, condition, or omission which Lender in the good faith reasonable exercise of Lender's discretion determines could be expected to have a material adverse effect upon: (a) the condition (financial or otherwise), results of operations, properties, assets, liabilities, businesses, operations, capitalization, equity, licenses, franchises or prospects of any Borrower or any Guarantor; (b) the ability of any Borrower or any Guarantor to perform any of the Obligations when and as required by the terms of the Loan Documents; (c) the rights and remedies of Lender as provided by the Loan Documents; or (d) the value, condition, use, or availability of any of the Collateral or upon any of Lender's liens and security interests securing the Obligations.

1.39.    "Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA which is maintained for employees of any Borrower, or any ERISA Affiliate of any Borrower.

1.40.    "Note" shall mean the SBA Note (Form 147) of even date herewith from Borrowers, as makers thereof, which is payable to the order of Lender in the stated principal amount of $324,000, as the same may be amended or otherwise modified from time to time.

1.41.    "Obligations" shall mean the continuing obligations of any Borrower or any Guarantor to pay to Lender the following: (a) sums due to Lender arising out of or in connection with the Loan or otherwise pursuant to the terms of the Loan Documents; (b) indemnification obligations owed by any Borrower to Lender in accordance with the terms of the Loan Documents; (c) Lender Expenses; (d) overdrafts of any Borrower upon any accounts with Lender; (e) all duties of payment and performance owed to Lender in connection with any guarantees; (f) all other Indebtedness or liability of any Borrower or any Guarantor to Lender, whether direct or indirect, joint or several, absolute or contingent, contemplated or not presently contemplated, now existing or hereafter arising (including, without limitation, all Indebtedness or liability of any Borrower arising out of or related to the Other Lender Loans); and (g) any Indebtedness or liability which may exist or arise as a result of any payment made by or for the benefit of any Borrower being avoided or set aside for any reason including, without limitation, any payment being avoided as a preference under Sections 547 and 550 of the United States Bankruptcy Code, as amended, or under any state law governing insolvency or creditors' rights.

1.42.    "Other Lender Loans" shall mean, collectively, any loans (other than the Loan) or credit accommodations made at any time by Lender to any Borrower or any Guarantor.

1.43.    "Owner" means with respect to each Borrower, each Person having legal or beneficial title to an ownership interest in a Borrower or a right to acquire such an interest, and "Owners" shall mean all of them, collectively.

5

1.44.    "Pass-Through Tax Liabilities" shall mean the amount of state and federal income tax paid or to be paid by the Owners on taxable income earned by a Borrower and attributable to the Owners as a result of such Borrower's "pass-through" tax status, assuming the highest marginal income tax rate for federal and state (for the state or states in which any owner is liable for income taxes with respect to such income) income tax purposes, after taking into account any deduction for state income taxes in calculating the federal income tax liability and all other deductions, credits, deferrals and other reductions available to the Owners from or through Borrower.

1.45.    "Permitted Liens" shall include (a) liens for taxes, assessments, or similar charges incurred in the ordinary course of business that are not yet due and payable, (b) liens in favor of Lender, (c) any lien on specifically allocated money or securities to secure payments under workmen's compensation, unemployment insurance, social security and other similar Laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations or appeal bonds, or to secure indemnity, performance or other similar bonds in the ordinary course of business, (d) liens permitted pursuant to the SBA Authorization, (e) liens securing purchase money Indebtedness incurred in connection with the acquisition of capital assets in connection with Borrowers' business operations, and (f) subsequently arising liens which are approved, in writing, by Lender and the SBA.

1.46.    "Person" shall mean any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, estate, unincorporated organization, joint venture, court, government or political subdivision or agency thereof, or other legal entity.

1.47.    "Real Property" shall mean, collectively: (a) any real property owned by any Borrower or being leased or used by any Borrower in the operation of its business; (b) any real property used for the storage of any Collateral; or (c) any other real property that may be pledged by any Borrower, any Guarantor or any other Person as collateral security for the Obligations.

1.48.    "Receivables" shall mean all of the Accounts, Instruments, Documents, General Intangibles, Chattel Paper, notes, notes receivable, drafts, acceptances, and choses in action, of any Borrower, now existing or hereafter created or acquired, and all proceeds and products thereof, and all rights thereto, arising from the sale or lease of or the providing of Inventory, Goods, or services by any Borrower to Account Debtors, as well as all other rights, contingent or non-contingent, of any kind of any Borrower to receive payment, benefit, or credit from any Person.

1.49.    "Records" shall mean correspondence, memoranda, tapes, discs, papers, books and other documents, or transcribed information of any type, whether expressed in ordinary, computer or machine language.

1.50.    "SBA" shall have the meaning set forth in Recital A of this Agreement.

1.51.    "SBA Authorization" shall have the meaning set forth in Recital B of this Agreement.

1.52.    "Subsidiary" shall mean, with respect to any Person, any other Person of which Capital Securities representing an aggregate of fifty percent (50%) or more of the Capital Securities or the ordinary voting power are, at the time as of which any determination is being made, owned or controlled directly, or indirectly through one or more intermediaries, by such Person.

1.53.    "Termination Event" shall mean:  (a) a "Reportable Event" described in Section 4043 of ERISA and the regulations issued thereunder, but not including any such event for which the 30-day

6

notice requirement has been waived by applicable regulation; (b) the withdrawal of any Borrower or an ERISA Affiliate of any Borrower from a Guaranteed Pension Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA; (c) the filing of a notice of intent to terminate a Guaranteed Pension Plan or the treatment of a Guaranteed Pension Plan amendment as a termination under Section 4041 of ERISA: the institution of proceedings to terminate a Guaranteed Pension Plan by the United States Pension Benefit Guarantee Corporation; (d) the withdrawal or partial withdrawal of any Borrower or an ERISA Affiliate of any Borrower from a Multiemployer Plan; or (e) any other event or condition which might reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Guaranteed Pension Plan.

     1.54.   "UCC" shall mean the Wisconsin Uniform Commercial Code, as amended.

ARTICLE 2
REPRESENTATIONS AND WARRANTIES

Borrowers make the representations and warranties set forth in this Article 2. Borrowers acknowledge Lender's justifiable right to rely upon these representations and warranties.

     2.1.   Authority; Approvals and Consents.

        (a)   Organization; Authority.  Each Borrower and the Corporate Guarantor is duly and validly organized, existing and, if applicable, in good standing, under the laws of the state of its organization, and has the corporate or company power and authority, as applicable, and all necessary licenses, permits and franchises, to own its assets and properties and to carry on its businesses as now conducted or presently contemplated.  Each Borrower and the Corporate Guarantor is duly licensed or qualified to do business and is in good standing in all other jurisdictions in which failure to do so could result in a Material Adverse Event.  Each Borrower and each Guarantor has the legal authority to enter into each of the Loan Documents to which it/he/she is a party and to perform, observe and comply with all of its/his/her respective agreements and obligations thereunder, including, without limitation the borrowings contemplated hereby.

        (b)   Approvals.  The execution and delivery by Borrowers and Guarantors of each of the Loan Documents, the performance by Borrowers and Guarantors of all of their respective agreements and obligations under the Loan Documents. and the borrowings contemplated by this Agreement, have been duly authorized by all necessary action on the part of Borrowers and do not and will not (i) contravene any provision of the organizational documents of any Borrower; (ii) conflict with, or result in a breach of the terms, conditions or provisions of, or constitute a default under, or result in the creation of any lien upon any of the property of any Borrower under any agreement, trust deed, indenture, mortgage or other instrument to which any Borrower is a party or by which any Borrower or any property of any Borrower is bound or affected (except for liens created for the benefit of Lender); (iii) violate or contravene any provision of any Law, rule or regulation (including, without limitation. Regulations G. T, U or X of the Board of Governors of the Federal Reserve System) or any order, ruling or interpretation thereunder or any decree, order of judgment of any court or governmental or regulatory authority. bureau, agency or official (all as from time to time in effect and applicable to any Borrower); or (iv) require any waivers, consents or approvals by any of the creditors of any Borrower or any Guarantor.

        (c)   Consents.  Other than filings and recordings required to perfect the security interests and liens granted hereunder, no approval, consent, order, authorization or license by, or giving notice to, or taking any other action with respect to, any governmental or regulatory authority or agency is required for the execution and delivery by any Borrower or any Guarantor, as applicable, of the Loan Documents or for the performance by any Borrower or any Guarantor, as applicable, of any of the

7

agreements and obligations thereunder.

2.2.     Accuracy of Information. All information, reports, and data submitted by or on behalf of Borrowers and Guarantors in connection with the Obligations, or in support thereof, are true, accurate, and complete in all material respects as of the date made and contain no knowingly false, incomplete or misleading statements.

2.3.     Financial Statements.  The financial statements of Borrowers that have been delivered to Lender prior to the Closing Date, fairly present the financial condition of Borrowers as of the respective dates thereof and the results and operations of Borrowers for the fiscal periods ended on such respective dates, all in accordance with GAAP or such other accounting method approved by Lender.  Borrowers have no direct or contingent liability or obligation known to Borrowers and not disclosed on the financial statements delivered to Lender. There has been no adverse change in the financial condition of Borrowers since the financial statements of Borrowers delivered to Lender prior to the date hereof, and Borrowers do not know of or have any reason to expect any material adverse change in the assets, liabilities, properties, business, or condition, financial or otherwise, of Borrowers.  The financial statements of Guarantors that have been delivered to Lender prior to the Closing Date, fairly present the financial condition of Guarantors as of the respective dates thereof.

2.4.     Binding Effect.  Each of the Loan Documents which any Borrower or any Guarantor has executed and delivered as contemplated and required to be executed and delivered by this Agreement, has been duly executed and delivered by any Borrower or any Guarantor, as applicable, and is the legal, valid and binding obligation of any Borrower and/or any Guarantor, as applicable, and is enforceable against any Borrower and any Guarantor, as applicable, in accordance with all stated terms.

2.5.     No Litigation.   There are no legal actions, suits or proceedings pending or, to the knowledge of Borrowers, threatened against any Borrower or any Guarantor before any court, governmental or administrative agency or arbitrator except as disclosed to Lender in writing prior to the date hereof.

2.6.     No Adverse Change.   Since the date of Borrowers' application to Lender for the Loan, there has been no material adverse change in the financial condition of Borrowers or any Guarantor or Borrowers' ability to repay the Loan.  Borrowers do not know of or have any reason to expect any material adverse change in Borrowers' assets, liabilities, properties, business, or condition, financial or otherwise.  There are no Insolvency Proceedings pending against any Borrower or any Guarantor.

2.7.     Compliance with Laws.  Borrowers have complied in all material respects with all applicable Laws, including, but not limited to, all Laws with respect to (a) all restrictions, specifications, or other requirements pertaining to products that it sells or to the services it performs, (b) the conduct of its business, and (c) the use, maintenance, and operation of the real and personal properties owned or leased by it in the conduct of its business.

2.8.     Child Support. Neither any Borrower nor any Guarantor, nor any other individual directly or indirectly owning fifty percent (50%) or more of the voting interests in any Borrower, is delinquent more than sixty (60) days under the terms of any: (a) administrative order; (b) court order; or (c) repayment agreement, requiring payment of child support.

2.9.     Taxes.  Borrowers have (a) filed all federal, state and local tax returns and other reports which Borrowers are required by Law to file prior to the date hereof and that are material to the conduct of the business of Borrowers, (b) paid or caused to be paid all taxes, assessments and other governmental charges that are due and payable prior to the date hereof, and (c) has made adequate provision for the

8

payment of such taxes, assessments or other charges accruing but not yet payable. Borrowers have no knowledge of any deficiency or additional assessment in connection with any taxes, assessments or charges not provided for on Borrowers' books of account or reflected in Borrowers' financial statements.

      2.10.   Environmental Conditions.  Borrowers represent and warrant that:

      (a)    at the time Borrowers submitted the application for the Loan to Lender, Borrowers were in compliance with all Environmental Laws pertaining to reporting or clean-up any Contaminant and regarding any permits needed for the creation, storage, transportation or disposal of any Contaminant;

      (b)    Borrowers have and will continue to comply with all Environmental Laws;

      (c)    neither any Borrower (and/or any of its principals) nor any Guarantor, has any knowledge of the actual or potential existence of any Contaminant that exists on, at, or under the Real Property, including groundwater, other than what was disclosed in any environmental report delivered to Lender;

      (d)    until the full repayment of the Loan, Borrowers will promptly notify Lender and the SBA if it knows or suspects that there has been, or may have been, a release of a Contaminant in, at, or under the Real Property, including groundwater, or if any Borrower or such Real Property are subject to any investigation or enforcement action by any federal, state or local environmental agency ("Agency") pertaining to any Contaminant on, at, or under the Real Property, including groundwater;

      (e)    Borrowers agree to indemnify, defend and hold harmless, Lender and the SBA and any assigns or successors in interest which take title to the Real Property, the Collateral or any other property of Borrowers, from and against all liabilities, damages, fees, penalties or losses arising out of any demand, claim or suit by any Agency or any other party relating to any Contaminant found on, at, or under the Real Property, including groundwater, regardless of whether such Contaminant resulted from Borrowers' operations; and

      (f)    there are no proceedings pending alleging any violation of any Environmental Laws by any Borrower or any Guarantor in regard to the Real Property or any Collateral.

      2.11.   Business Organization; Ownership.  Since the date of Borrowers' application to Lender for the Loan there has been no: (a) change in the stock or equity ownership of any Borrower (including the number and identity of the owners, shareholders, officers, directors, or the percentage of shares or ownership); (b) change in the form of business organization of any Borrower; or (c) material change in the operation of any Borrower, including the type of business or affiliation with other businesses, which would render any Borrower ineligible for SBA assistance.

      2.12.   SBA Authorization.  All warranties, covenants and representations applicable to any Borrower or any Guarantor contained in the SBA Authorization are true, accurate and in full force and effect, and Borrowers have complied with all covenants in the SBA Authorization that are applicable to any Borrower.

      2.13.   Approvals, Licenses and Permits.  Borrowers have obtained and possesses all franchises, approvals, licenses, permits contracts, merchandising agreements, permits, business licenses, and governmental approvals, registrations and exemptions necessary for the use and occupancy of the Real Property and the lawful operation of its businesses as presently conducted and as anticipated to be conducted after the Closing. Borrowers have secured all necessary approvals or consents required with

respect to this transaction by any mortgagor, creditor or other party having a financial interest in any Borrower.

2.14.  Insurance.  Borrowers have obtained or caused to be obtained all insurance, including hazard insurance, liability insurance, personal property, worker's compensation insurance and such other insurance coverages as may be required in accordance with the terms and conditions of the SBA Authorization and this Agreement, and in amounts and on policy forms acceptable to Lender.

2.15.  Subsidiaries.  Borrowers do not have any Subsidiaries.

2.16.  Title to Collateral.  A Borrower or a Guarantor has good and marketable title to the Collateral.

2.17.  Other Names.  No Borrower has changed its name, been the surviving entity in a merger, or changed the location of its chief executive office within the last five (5) years.  Borrowers do not operate under any trade or fictitious name.

2.18.  No Events of Default.  No action, event, or condition currently exists that constitutes a Default or an Event of Default.

2.19.  Guarantee. The Guarantees signed by Guarantors are the valid and binding obligation of Guarantors and are fully enforceable against Guarantors in accordance with their terms and conditions.

2.20.  Chief Place of Business. The chief executive office, chief place of business, and the place where Borrowers keep their Records concerning the Collateral is 901 Raddant Rd., Batavia, IL 60515.

2.21.  No Labor Agreements.  Borrowers are not subject to any collective bargaining agreement or any agreement, contract, decree or order requiring it to recognize, deal with or employ any Persons organized as a collective bargaining unit or other form of organized labor.

2.22.  Fair Labor Standards Act.  Borrowers have complied in all material respects with the Fair Labor Standards Act of 1938, as amended.

2.23.  Location of Collateral.  The Collateral is and shall be kept solely at Borrowers' principal place of business identified in Section 2.20 above, and shall not be moved, sold or otherwise disposed of without prior notification to Lender, except as expressly provided herein.  None of the Collateral is stored with or in the possession of any bailee, warehouseman, or other similar Person.

2.24.  Employee Benefit Plans.

(a)  Compliance.  Borrowers and their ERISA Affiliates are in compliance in all material respects with all applicable provisions of ERISA and the regulations thereunder and of the Code with respect to all Employee Benefit Plans.

(b)  Absence of Termination Event.  No Termination Event has occurred or is reasonably expected to occur with respect to any Guaranteed Pension Plan.

(c)  Actuarial Value.  The actuarial present value (as defined in Section 4001 of ERISA) of all benefit commitments (as defined in Section 4001 of ERISA) under each Guaranteed Pension Plan does not exceed the assets of that plan.

10

(d)     No Withdrawal Liability.   Neither any Borrower nor any of its ERISA Affiliates has incurred or reasonably expects to incur any withdrawal liability under ERISA in connection with any Multiemployer Plans.

ARTICLE 3
AFFIRMATIVE COVENANTS

Each Borrower covenants and agrees during the term of this Agreement and while any Obligations are outstanding and unpaid to do and perform each of the acts and promises set forth in this Article 3.

3.1.     Payment.   All Obligations shall be paid and performed in full when and as due.  All Lender Expenses shall be paid on demand of Lender.  Borrowers shall pay all fees required to be paid by Borrowers as set forth in the SBA Authorization.

3.2.     Insurance.

(a)     Casualty Insurance.  Borrowers shall maintain for all of their assets and properties, whether real, personal, or mixed and including but not limited to the Collateral, fire and extended coverage casualty insurance in the amount of the full replacement cost of the Collateral or the outstanding balance of the Loan, whichever is greater, or in such other amounts satisfactory to Lender and sufficient to prevent any co-insurance liability (which amount shall be the full insurable value of the assets and properties insured unless Lender in writing agrees to a lesser amount), naming Lender as mortgagee and lender's loss payable with respect to the real property Collateral and the personal property Collateral, respectively, with an insurance company and upon policy forms containing standard mortgagee clauses which are acceptable to and approved by Lender.  Borrowers shall submit to Lender a certificate evidencing the casualty insurance policy and paid receipts evidencing payment of the premiums due on the same.  The casualty insurance policy shall be endorsed so as to make it non-cancellable unless at least thirty (30) days prior notice of cancellation is provided to Lender.

(b)     Liability And Worker's Compensation Insurance.  Borrowers shall maintain public liability and property damage insurance in the amount of $1,000,000, with an aggregate of $2,000,000, or in such other amounts, with insurance companies, and upon policy forms acceptable to and approved by Lender, naming Lender as an additional insured.  In addition, Borrowers shall maintain worker's compensation insurance in statutory required amounts, with insurance companies, and upon policy forms acceptable to and approved by Lender.  Borrowers, on request, shall submit to Lender copies of the liability and worker's compensation insurance policies and receipts evidencing the payment of premiums due thereon or, alternatively, certificates from the insurance companies certifying to the existence of the policies, summarizing the terms of the policies, and indicating the payment of premiums due thereon.  The liability insurance policy shall be endorsed so as to make it non-cancellable unless at least thirty (30) days prior notice of cancellation is provided to Lender.

(c)     Flood Insurance.  If necessary, Borrowers shall maintain for all of its assets and the Real Property, whether real, personal, or mixed and including but not limited to the Collateral, flood insurance coverage in an amount satisfactory to Lender and sufficient to prevent any co-insurance liability (which amount shall be the full insurable value of the assets and properties insured unless Lender in writing agrees to a lesser amount), naming Lender as mortgagee and lender's loss payable with respect to the Collateral, with an insurance company and upon policy forms containing standard mortgagee clauses which are acceptable to and approved by Lender.  Borrowers shall submit to Lender a copy of the flood insurance policy and paid receipt evidencing payment of the premiums due on the same.  The flood insurance policy shall be endorsed so as to make it non-cancellable unless thirty (30) days prior notice of

11

cancellation is provided to Lender.

(d) <u>Automobile</u>. Comprehensive Automobile Liability covering all owned, non-owned and hired vehicles with limits of not less than $1,000,000 combined single limit.

(e) <u>Construction</u>. During construction of any improvements at the Real Property and during any period in which substantial alterations or repairs at the Real Property are being undertaken, Borrowers shall obtain and maintain, or require their general contractor to obtain and maintain, (i) builder's risk insurance (on a completed value, non-reporting basis) against "all risks of physical loss," including collapse and transit coverage, with deductibles not to exceed $10,000, in non-reporting form, covering the total replacement cost of work performed and equipment, supplies and materials furnished in connection with such construction or repair of improvements or equipment, together with "soft cost" and such other endorsements as Lender may reasonably require, and (ii) general liability, worker's compensation and automobile liability insurance with respect to the improvements being constructed, altered or repaired.

(f) <u>Product Liability</u>. Product liability insurance in such amounts as is customarily maintained by companies engaged in the same or similar businesses as any Borrower.

(g) <u>Proceeds</u>. The proceeds of any insured loss shall be applied by Lender to the Obligations, in such order of application as determined by Lender, unless Lender in its sole discretion permits the use thereof to repair or replace damaged or destroyed Collateral or Real Property, as applicable.

(h) <u>Life Insurance</u>. Borrowers shall maintain a life insurance policy, in the face amount of at least $324,000 on the life of Pasquale Roppo (the "<u>Life Insurance Policy</u>"), and the Life Insurance Policy shall be assigned to Lender as security for the Obligations. At the request of Lender, from time to time, Borrowers shall deliver to Lender evidence of the payment of all premiums on the Life Insurance Policy.

3.3. <u>Environmental Covenants</u>. Borrowers shall comply with all Environmental Laws. Borrowers assume full responsibility for all costs incurred in any clean-up of environmental contamination in connection with any of the Collateral and agrees to indemnify Lender and the SBA against payment of any such costs or expenses. Until full repayment of the Obligations, Borrowers will promptly notify Lender and the SBA if it knows, suspects, or believes any of the following: (a) there has been, or may have been a release of a Contaminant in, at, or under the Real Property, including groundwater; (b) any Borrower is in violation of any Environmental Laws; or (c) any Borrower, any Guarantor, the Real Property, or any other Collateral is subject to any investigation or enforcement action by any governmental agency pertaining to any Contaminant on, at, or under the Real Property or any other Collateral, including groundwater, regardless of whether such Contaminant resulted from Borrowers' operations.

3.4. <u>Books and Records</u>. Borrowers shall notify Lender in writing if any Borrower modifies or changes its method of accounting or enters into, modifies, or terminates any agreement presently existing, or at any time hereafter entered into with any third party accounting firm for the preparation and/or storage of Borrowers' accounting records.

3.5. <u>Equal Opportunity</u>. Borrowers shall post SBA Form 722, Equal Opportunity Poster, where it is clearly visible to employees, applicants for employment, and the general public, and shall comply with the requirements of SBA Form 793, Notice to New Borrowers.

3.6.     Notice of Litigation and Proceedings.  Borrowers shall give prompt notice to Lender of any action, suit, citation, violation, direction, notice or proceeding before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting any Borrower, or the assets or properties thereof, which, if determined adversely to any Borrower (a) could require any Borrower to pay over more than $5,000 or deliver assets the value of which exceeds that sum (whether or not the claim is considered to be covered by insurance), or (b) could reasonably be expected to result in a material adverse change in Borrowers' assets, liabilities, properties, business, or condition, financial or otherwise.

3.7.     Payment of Liabilities to Third Persons.  Borrowers shall pay when and as due, or within applicable grace periods, all liabilities due to third persons, except when the amount thereof is being contested in good faith by appropriate proceedings and with adequate reserves therefore being set aside by Borrowers.

3.8.     Notice of Change of Business Location.  Borrowers shall notify Lender thirty (30) days in advance of (a) any change in the location of its existing offices or place of business, (b) the establishment of any new, or the discontinuation of any existing, place of business, and (c) any change in or addition to the locations at which the Collateral is warehoused.  Prior to moving any Collateral to any location not owned by any Borrower (other than deliveries to Account Debtors of sold or leased items), Borrowers shall obtain and deliver to Lender an agreement, in form and substance acceptable to Lender, pursuant to which the owner of such location agrees to (i) subordinate any rights which it may have, or thereafter may obtain, in any of the Collateral to the rights and security interests of Lender in the Collateral, and (ii) allow Lender access to the Collateral in order to remove the Collateral  from such location.  In the event any Collateral is stored with a warehousemen or other bailee, and the Collateral is evidenced by a negotiable document of title, Borrowers shall immediately deliver the document of title to Lender.

3.9.     Payment of Taxes. Borrowers shall pay or cause to be paid when and as due, all taxes, assessments and charges or levies imposed upon any Borrower, the Collateral or any of Borrowers' other assets or property or which it is required to withhold and pay over to a taxing authority or which it must pay on its income.

3.10.     Inspections of Records. Lender and the SBA shall have the right to call at Borrowers' places of business at intervals to be determined by Lender or the SBA, before or after a Default or Event of Default, and without hindrance or delay to (a) audit, inspect, verify, check and make extracts or photocopies from the Records of Borrowers and/or the SBA and other data relating to the Collateral or Borrowers' Indebtedness, and/or (b) appraise the assets of any Borrower. Borrowers shall reimburse Lender and the SBA for the entire cost of all of such audits, inspections, verifications, copying, extractions, and appraisals.

3.11.     Documentation of Collateral.  Borrowers agrees that upon the request of Lender, Borrowers will provide Lender with (a) written statements or schedules identifying and describing the Collateral, and all additions, substitutions, and replacements thereof, in such detail as Lender may require, (b) copies of Account Debtors' invoices or billing statements, (c) evidence of shipment or delivery of goods or merchandise to or performance of services for Account Debtors, and (d) such other schedules and information as Lender reasonably may require.  The items to be provided under this Section shall be in form satisfactory to Lender and are to be executed and delivered to Lender from time to time solely for Lender's convenience in maintaining Records of the Collateral. The failure of Borrowers to give any of such items to Lender shall not affect, terminate, modify or otherwise limit Lender's security interests in the Collateral. Lender shall have the right, at any time and from time to time, to verify the eligibility of Borrowers' Receivables, including obtaining verification of the

Receivables directly from Account Debtors.

3.12.    Reporting Requirements.  Borrowers shall furnish to Lender such information respecting the business, assets and financial condition of Borrowers and Guarantors as Lender may reasonably request and, without request:

(a)    as soon as available, and in any event, the earlier of (i) fifteen (15) days after filing or (ii) in the case of extension, no later than six (6) months following the first filing due date, a copy of the annual corporate tax returns (federal and state) for each Borrower and the Corporate Guarantor, together with a copy of the filed extension if the filing deadline was extended:

(b)    as soon as available, and in any event, the earlier of (i) fifteen (15) days after filing or (ii) in the case of extension, no later than six (6) months following the first filing due date, a copy of the individual tax returns (federal and state) for the Individual Guarantor, together with a copy of the filed extension if the filing deadline was extended;

(c)    as soon as available, and in any event no later than April 30 of each year, a personal financial statement for the Individual Guarantor; and

(d)    in addition to the items set forth in Sections 3.12(a) through 3.12(c) above, Borrowers agree to submit to Lender (i) all other certifications, documents or other information Lender is required by the SBA Authorization to obtain from Borrowers or any third party and (ii) such other information respecting the condition or operations, financial or otherwise, of Borrowers as Lender may reasonably request from time to time.

3.13.    Financial Information.  Borrowers shall keep proper books of account in a manner satisfactory to Lender.  Each Borrower irrevocably authorizes Lender to obtain from any and all governmental agencies and departments reports of examinations or any records pertaining to any Borrower.

3.14.    Compliance With Laws.  Borrowers shall comply in all material respects with all applicable Laws, including, but not limited to, all Laws with respect to: (a) all restrictions, specifications, or other requirements pertaining to products that it sells or to the services it performs, (b) the conduct of its business, (c) the use, maintenance, and operation of the real and personal properties owned or leased by it in the conduct of its business, and (d) the obtaining and maintenance of all necessary licenses, franchises, permits and governmental approvals, registrations and exemptions necessary to engage in its business.

3.15.    Compliance with SBA Authorization; Use of Loan Proceeds.  Borrowers shall comply with all terms and provisions of the SBA Authorization including, without limitation, the use of all proceeds of the Loan as provided in Paragraph G of the SBA Authorization.

3.16.    Maintain Existence.  Borrowers shall maintain, in current status or good standing, as applicable, its existence, its rights and privileges as a legal entity organized under the laws of the state in which it was organized, and shall qualify and remain qualified and in good standing in each jurisdiction in which its present or future operations or the ownership of its properties requires such qualification.

3.17.    Regulations.  Borrowers agree to fully comply with Section 503 of the Small Business Investment Act, 15 USC 697, and with all regulations promulgated thereunder, as applicable.

3.18.    Maintenance of Fixed Assets.  Borrowers shall maintain and preserve all of its fixed assets in a state of good and efficient working order, normal wear and tear and damage by casualty

14

excepted.

3.19.  Collection of Accounts: Sale of Inventory.  Borrowers shall only collect Accounts and Receivables and sell Inventory in the ordinary course of Borrowers' business.

3.20.  Consignments.  Borrowers shall advise Lender of all Persons to whom it has consigned or assigned Inventory for sale or distribution, and the location of the Inventory subject to any such consignment or assignment arrangement. Borrowers shall (a) duly and properly file financing statements in all applicable places of public record with respect to each of such consignments or assignments, which filings shall comply with the UCC and with all other requirements necessary for any Borrower to protect its interests therein under applicable Laws, (b) supply Lender with prior evidence of such filing and with a financing statement, judgment and tax lien search in the name of the consignee or assignee in all applicable places of public record, and (c) provide written notification to any holder of any security interests in the inventory of the consignee or assignee who has filed a financing statement before any Borrower files any financing statements, which notice shall state that Borrowers expect to deliver goods on consignment, shall describe the goods by item or type and which notification shall be received by any such holder within five (5) years before the consignee receives possession of the goods and at five (5) year intervals thereafter.

3.21.  American-Made Products.  To the extent feasible, Borrowers shall purchase only American-made equipment and products with proceeds of the Loan.

3.22  Employee Benefit Plans and Guaranteed Pension Plans.  Borrowers will, and will cause each of its ERISA Affiliates to:  (a) comply with all requirements imposed by ERISA and the Code, applicable from time to time to any of its Guaranteed Pension Plans or Employee Benefit Plans; (b) make full payment when due of all amounts which, under the provisions of Employee Benefit Plans or under applicable Law, are required to be paid as contributions thereto; (c) not permit to exist any material accumulated funding deficiency, whether or not waived; (d) file on a timely basis all reports, notices and other filings required by any governmental agency with respect to any of its Employee Benefit Plans; (e) make any payments to Multiemployer Plans required to be made under any agreement relating to such Multiemployer Plans, or under any Law pertaining thereto; (f) not amend or otherwise alter any Guaranteed Pension Plan if the effect would be to cause the actuarial present value of all benefit commitments under any Guaranteed Pension Plan to be less than the current value of the assets of such Guaranteed Pension Plan allocable to such benefit commitments; (g) furnish to all participants, beneficiaries and employees under any of the Employee Benefit Plans, within the periods prescribed by Law, all reports, notices and other information to which they are entitled under applicable Law; and (h) take no action which would cause any of the Employee Benefit Plans to fail to meet any qualification requirement imposed by the Code. As used in this Section, the term "accumulated funding deficiency" has the meaning specified in Section 302 of ERISA and Section 412 of the Code, and the terms "actuarial present value", "benefit commitments" and "current value" have the meaning specified in Section 4001 of ERISA.

3.23.  Further Assurances and Power of Attorney. Borrowers shall execute from time to time such other and further documents, including but not limited to deeds of trust, mortgages, promissory notes, security agreements, agreements, assignments, financing statements, and the like which, in the sole opinion of Lender or Lender's counsel, may be necessary to perfect, or complete the security interests and liens in the Collateral and the purposes and intentions of the Loan Documents, it being the intention of Borrowers to provide hereby a full and absolute warranty of further assurance to Lender.  If any Borrower fails to execute any such document within five (5) Business Days of being requested to do so by Lender, Each Borrower hereby appoints Lender or any officer of Lender as its attorney-in-fact for purposes of executing such documents in the name, place and stead of Borrowers, which power of attorney shall be

considered as coupled with an interest and irrevocable.

3.24.    Advancements. If any Borrower fails to perform any of its agreements or covenants contained in this Agreement or if any Borrower fails to protect or preserve the Collateral or the status and priority of the security interest of Lender in the Collateral, Lender may make advances to perform the same on behalf of any Borrower to protect or preserve the Collateral  or the status and priority of the security interest of Lender in the Collateral, and all sums so advanced shall immediately upon advance become secured by the security interests granted in this Agreement, and shall become part of the principal amount owed to Lender with interest to be assessed at the applicable rate thereon and subject to the terms and provisions of this Agreement and all of the Loan Documents. Borrowers shall repay on demand all sums so advanced on Borrowers' behalf, plus all expenses or costs incurred by Lender, including reasonable legal fees, with interest thereon at the highest rate authorized in the Note.  The provisions of this Section shall not be construed to prevent the institution of the rights and remedies of Lender upon the occurrence of an Event of Default. The authorization contained in this Section is not intended to impose any duty or obligation on Lender to perform any action or make any advancement on behalf of Borrowers and is intended to be for the sole benefit and protection of Lender.

3.25.    Lien Priority.  Lender shall at all times have the following lien priorities in the Collateral (together with all replacements, accessions, proceeds (including insurance proceeds) and products thereof in whatever form) to secure the Loan: (a) a second priority lien on all assets and property rights of Borrowers including, without limitation, all Equipment, Inventory, Accounts, Instruments, Chattel Paper and General Intangibles (subject only to a first priority lien in favor of Lender securing the principal sum of $2,706,600); (b) a second priority mortgage lien on the Real Property located at 901 Raddant Rd., Batavia, IL 60515 (subject only to a first priority mortgage lien in favor of Lender securing the principal sum of $2,706,600); (c) a third priority mortgage lien on the Real Property located at 840 Napa Ln., Aurora, IL 60502 (subject only to a first priority mortgage lien in favor of U.S. Bank, National Association, securing the principal sum of $315,000, and a second priority mortgage lien in favor of Lender securing the principal sum of $2,706,600)); and (d) a first priority assignment of the proceeds of the Life Insurance Policy.

ARTICLE 4
NEGATIVE COVENANTS

Borrowers covenant while any Obligations are outstanding and unpaid not to do or to permit to be done or to occur any of the acts or occurrences set forth in this Article 4 without the prior written authorization of Lender.

4.1.    No Change of Name, Merger, Etc.  No Borrower shall change its name or enter into any merger, consolidation, reorganization or recapitalization.

4.2.    No Sale or Transfer of Assets.  Borrowers shall not sell, transfer, lease or otherwise dispose, or allow to be sold, transferred, leased or otherwise disposed of, all or any part of the Collateral except that Inventory may be sold to Account Debtors in the ordinary course of Borrowers' business.

4.3.    No Encumbrance of Assets.  Borrowers shall not mortgage, pledge, grant or permit to exist a security interest in or lien upon any of the Collateral except for Permitted Liens.

4.4.    No Assignment. Borrowers shall not assign or attempt to assign this Agreement.

4.5.    No Ownership Changes.   There shall be no transfer of any Capital Securities of any Borrower from the Capital Securities existing as of the Closing Date.

4.6.     No Indebtedness.  Borrowers shall not incur, create, assume, or permit to exist any Indebtedness except (a) the Obligations, and (b) Indebtedness secured by Permitted Liens.

4.7.     Restricted Payments.  No Borrower shall not (a) declare or pay any non-cash dividends or distributions, (b) purchase, redeem, retire, or otherwise acquire for value any of its Capital Securities now or hereafter outstanding, (c) make any distribution of assets to its stockholders, directors, partners, managers or members as such, whether in assets or in obligations of Borrower, (d) allocate or otherwise set apart any sum for the purchase, redemption, or retirement of any shares of its Capital Securities, (e) make any other distribution by reduction of capital or otherwise in respect of any shares of its Capital Securities, or (f) pay any cash dividends or distributions to any Owner without Lender's prior written consent, provided, however, that a Borrower may, without Lender's consent, pay Pass-Through Tax Liabilities so long as (i) each Borrower had an after-tax profit for its latest full Fiscal Year ended, (ii) no Event of Default has occurred and is continuing, (iii) following any such payment each Borrower will remain in compliance with all of the covenants, terms and conditions of this Agreement, and (iv) Borrowers and their Subsidiaries are current in all material respects on their Indebtedness.

4.8.     Transactions with Affiliates.  Borrowers shall not make any contract for the purchase of any items from any Affiliate or the performance of any services (including employment services) by any Affiliate, unless such contract is on terms which fairly represent generally available terms to be obtained in transactions of a similar nature with independent third Persons.

4.9.     Loans, Investments and Sale-Leasebacks.  Borrowers shall not make any advance, loan, investment, or material acquisition of assets or enter into any sale-leaseback transactions.

4.10.    No Acquisition of Capital Securities or Assets of Third Persons.  Borrowers shall not acquire any Capital Securities in, or all or substantially all of the assets of, any Person.

4.11.    No Alteration of Structure or Operations.  No Borrower shall amend or change materially its capital structure or its line or scope of business, nor shall it engage in business ventures other than those in which it is presently engaged.

4.12.    Unpermitted Uses of Loan Proceeds.  Borrowers shall not use any part of the proceeds of the Loan hereunder for any purpose which constitutes a violation of, or is inconsistent with, regulations of the Board of Governors of the Federal Reserve System, including without limitation, the purchase or carrying of (or refinancing of Indebtedness originally incurred to purchase or carry) margin securities.

4.13.    Changes In Fiscal Year.  Borrowers shall not change their Fiscal Year.

4.14.    Limitation on Issuance of Capital Securities.  Borrowers shall not issue or sell any Capital Securities in Borrowers that, by its terms or by the terms of any security into which it is convertible or exchangeable, is, or upon the happening of an event or passage of time would be (a) convertible or exchangeable into a liability of Borrowers, or (b) required to be redeemed or repurchased, including at the option of the holder, in whole or in part, or has, or upon the happening of an event or passage of time would have, a redemption or similar payment due.

## ARTICLE 5
## EVENTS OF DEFAULT

The occurrence of any of the following events shall constitute Events of Default and shall entitle Lender to exercise Lender's rights and remedies under Article 6 of this Agreement.

17

5.1.     Failure To Pay.    Borrowers shall fail to pay (a) any installment of the principal of or interest on the Loan; or (b) any of the other Obligations; or (c) any fee, expense or other amount due under the Loan Documents or any of the other Obligations.

5.2.     Default Under Loan Documents.    A breach of or default by any Borrower or any Guarantor under any of the terms, covenants, or conditions (other than the payment obligations described in Section 5.1 above) set forth in this Agreement, the SBA Authorization or any other Loan Document.

5.3.     Representation or Warranty; Certifications.    The failure of any representation or warranty made by any Borrower or any Guarantor to be true in any material respect, as of the date made, or if any of the certifications made by Borrowers to Lender in Borrowers' Certification of even date herewith are not true or become not true.

5.4.     Judgments.    Any Borrower or any Guarantor shall suffer final judgments for the payment of money aggregating in excess of $5,000 and shall not discharge the same within a period of thirty (30) days unless, pending further proceedings, execution has not been commenced or if commenced has been effectively stayed.

5.5.     Levy by Judgment Creditor.    A judgment creditor of any Borrower or any Guarantor obtaining possession of any of the Collateral by any means, including but not limited to levy, distraint, replevin or self-help, and such Borrower or such Guarantor fails to remedy same within thirty (30) days thereof; or a writ of garnishment is served on Lender relating to any of the accounts of any Borrower or any Guarantor maintained by Lender.

5.6.     Failure to Pay Liabilities.    Any Borrower fails to pay any debt due any third Person and such failure continues beyond any applicable grace period, unless such Borrower holds a reasonably good faith defense to payment and has set aside reasonable reserves for the payment thereof.

5.7.     Involuntary Insolvency Proceedings.    The institution of involuntary Insolvency Proceedings against any Borrower and the failure of any such Insolvency Proceedings to be dismissed before the earliest to occur of (a) the date which is ninety (90) days after the institution of such Insolvency Proceedings, (b) the entry of any order for relief in the Insolvency Proceeding or any order adjudicating any Borrower insolvent, or (c) the impairment (as to validity, priority or otherwise) of any security interest or lien of Lender in any of the Collateral.

5.8.     Voluntary Insolvency Proceedings.    The commencement by any Borrower of Insolvency Proceedings.

5.9.     Insolvency Proceedings Pertaining to Guarantor.    The occurrence of any of the events listed in Sections 5.7 and 5.8 above to any Guarantor.

5.10.   Material Adverse Event.    The occurrence of a Material Adverse Event.

5.11.   Default by a Guarantor.    The failure by any Guarantor to satisfy any obligation imposed upon it, him or her in any Guarantee or other Loan Document, or the death of the Individual Guarantor.

5.12.   Attempt to Terminate Guarantee.    The receipt by Lender of notice from any Guarantor that such Guarantor is attempting to terminate or limit any portion of its, his or her obligations under any Guarantee.

18

5.13    ERISA.  If any Termination Event shall occur and as of the date thereof or any subsequent date, the sum of the various liabilities of a Borrower and its ERISA Affiliates (such liabilities to include, without limitation, any liability to the Pension Benefit Guarantee Corporation (or any successor thereto) or to any other party under Sections 4062, 4063, or 4064 of ERISA or any other provision of Law and to be calculated after giving effect to the tax consequences thereof) resulting from or otherwise associated with such event exceeds $1,000; or any Borrower or any of its ERISA Affiliates as an employer under any Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plans and the plan sponsors of such Multiemployer Plans shall have notified such withdrawing employer that such employer has incurred a withdrawal liability requiring a payment in an amount exceeding $1,000.

5.14.    Transfer of Capital Securities.  The transfer of any Capital Securities of any Borrower from the Capital Securities existing as of Closing Date, the pledge of any Capital Securities of any Borrower except to Lender, or the issuance of any additional Capital Securities in any Borrower which issuance has the effect of diluting the existing interests of the existing Capital Securities of such Borrower.

5.15.    Dissolution.  The dissolution of any Borrower or the Corporate Guarantor.

5.16.    Indictment.  The indictment of the Individual Guarantor for a felony under any federal, state or other Law.

5.17.    Injunction.  The issuance of any injunction against any Borrower which enjoins or restrains such Borrower from continuing to conduct any material part of Borrowers' business affairs.

5.18.    Notice of Tax Lien, Levy, Seizure or Attachment.  A notice of lien, levy or assessment is filed of record with respect to all or any portion of Borrowers' assets by the United States, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency, including, without limitation, the Internal Revenue Service or the United States Pension Benefit Guarantee Corporation, or any taxes or debts owing to any of the foregoing becomes a lien or encumbrance upon all or any portion of Borrowers' assets, or the making or any attempt by an Person to make any levy, seizure or attachment upon any of the Collateral, or if all or any portion of the Collateral comes within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors.

5.19.    Cross-Default.  The occurrence of any Event of Default hereunder shall constitute a default and event of default on all Other Lender Loans and under all loan documents executed in connection with the Other Lender Loans.  The occurrence of any default or event of default on any Other Lender Loans shall constitute and Event of Default hereunder.

### ARTICLE 6
### RIGHTS AND REMEDIES ON THE OCCURRENCE
### OF AN EVENT OF DEFAULT

6.1.    Lender's Specific Rights and Remedies.  In addition to all other rights and remedies provided by Law and the Loan Documents, upon the occurrence of any Event of Default, Lender may (a) accelerate and call immediately due and payable all or any part of the Obligations, (b) seek specific performance or injunctive relief to enforce performance of the undertakings, duties, and agreements provided in the Loan Documents, whether or not a remedy at law exists or is adequate, (c) exercise any rights of a secured creditor under the UCC, including the right to take possession of the personal property Collateral without the use of judicial process or hearing of any kind and the right to require Borrowers to assemble the Collateral at such place as Lender may specify, and/or (d) otherwise foreclose or enforce all

or any security interests, mortgage liens, deeds of trust, liens, assignments, or pledges created by this Agreement or any other Loan Document.

6.2. <u>Automatic Acceleration</u>. Upon the occurrence of an Event of Default as described in Sections 5.7, 5.8 or 5.9 of this Agreement, the Obligations shall be automatically accelerated and due and payable without any notice, demand or action of any type on the part of Lender.

6.3. <u>Sale of Collateral</u>. In addition to any other remedy provided herein, upon the occurrence of an Event of Default, Lender, in a commercially reasonable fashion, may sell at public or private sale or otherwise realize upon, the whole or, from time to time, any part of all Collateral which is personal property, or any interest which Borrowers may have therein. After deducting from the proceeds of sale or other disposition of such Collateral all expenses, including all expenses for legal services, Lender shall apply such proceeds as provided in this Agreement and the other Loan Documents, and otherwise as required by applicable Law. Notice of any sale or other disposition (other than sales or other dispositions of Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market) shall be given to Borrowers not less than ten (10) calendar days before the time of any intended public sale or of the time after which any intended private sale or other disposition of the Collateral is to be made, which Borrowers hereby agree shall be commercially reasonable notice of such sale or other disposition. Borrowers shall assemble, or shall cause to be assembled, at Borrowers' own expense, the Collateral at such place or places as Lender shall designate. At any such sale or other disposition, Lender may, to the extent permissible under applicable Law, purchase the whole or any part of the Collateral, free from any right of redemption on the part of Borrowers, which right is hereby waived and released to the extent lawfully permitted. Without limiting the generality of any of the rights and remedies conferred upon Lender under this Section, Lender may, to the full extent permitted by applicable Law, (a) enter upon the premises of Borrowers, exclude therefrom Borrowers or any Person connected therewith, and take immediate possession of the Collateral, either personally or by means of a receiver appointed by a court of competent jurisdiction, using all necessary force to do so; at Lender's option, use, operate, manage, and control the Collateral in any lawful manner, (b) collect and receive all income, revenue, earnings, issues, and profits therefrom, and (c) maintain, alter or remove the Collateral as Lender may determine in Lender's discretion. Any remedies permitted by this Section 6.3 shall be permitted under the laws of the State of Wisconsin.

6.4. <u>Remedies Cumulative</u>. The rights and remedies provided in this Agreement and in the other Loan Documents or otherwise under applicable Laws shall be cumulative and the exercise of any particular right or remedy shall not preclude the exercise of any other rights or remedies in addition to, or as an alternative of, such right or remedy.

ARTICLE 7<br>GENERAL CONDITIONS AND TERMS

7.1. <u>Obligations are Unconditional</u>. The payment and performance of the Obligations shall be the absolute and unconditional duty and obligation of Borrowers, and shall be independent of any defense or any rights of set-off, recoupment or counterclaim which Borrowers might otherwise have against Lender. Borrowers shall pay the payments of the principal and interest to be made upon the Obligations, free of any deductions and without abatement, diminution or set-off other than those herein expressly provided. Until such time as the Obligations have been fully paid and performed, Borrowers shall not (a) suspend or discontinue any payments required by the Loan Documents or (b) fail to perform and observe all of Borrowers' covenants and agreements set forth in the Loan Documents.

7.2 <u>Payments</u>. All payments received by Lender which are to be applied to reduce the Obligations shall be credited to the balances due from Borrowers pursuant to the normal and customary

20

practices of Lender, but shall be provisional and shall not be considered final unless and until such payment is not subject to avoidance under any provision of the United States Bankruptcy Code, as amended, including Sections 547 and 550, or any state law governing insolvency or creditors' rights. If any payment is avoided or set aside under any provision of the United States Bankruptcy Code, including Sections 547 and 550, or any state law governing insolvency or creditors' rights, the payment shall be considered not to have been made for all purposes of this Agreement and Lender shall adjust its records to reflect the fact that the avoided payment was not made and has not been credited against the Obligations.

7.3.    <u>Indemnity</u>.  Borrowers agree to defend, indemnify and hold harmless Lender and its Affiliates, and all of Lender's and its Affiliates' employees, agents, officers and directors, from and against any losses, penalties, fines, liabilities, settlements, damages, costs and expenses, suffered in connection with any claim, investigation, litigation or other proceeding (whether or not Lender or an affiliated entity is a party thereto) and the prosecution and defense thereof, arising out of or in any way connected with any Loan Document, including without limitation reasonable attorneys' and consultant's fees, except to the extent that any of the foregoing directly result from the gross negligence or willful misconduct of the party seeking indemnification therefore.  Notwithstanding any termination of this Agreement or payment and performance of the Obligations, the indemnities provided for herein shall continue in full force and effect and shall protect all of the above-described Persons against events arising after such termination, payment or performance as well as before.

7.4.    <u>Lender Expenses</u>.  The Loan and all transactions relating thereto and provided for herein shall be made at no cost to Lender and all Lender Expenses shall be paid by Borrowers, whether incurred prior to or after closing of the Loan, so that the subject transactions shall at all times be totally cost free to Lender.

7.5.    <u>Incorporation; Construction of Inconsistent Provisions</u>.  The terms and conditions of the Loan Documents are incorporated by reference and made a part hereof, as if fully set forth herein. The provisions of the Note or the other Loan Documents are not intended to supersede the provisions of each other or this Agreement, but shall be construed as supplemental to this Agreement and to each other.  In the event of any inconsistency or conflict between the provisions of the Note or any other Loan Document, and this Agreement, the terms of the provision most favorable to Lender (as determined by Lender in its sole and absolute discretion) shall apply.

7.6.    <u>Waivers</u>.  Lender at any time or from time to time may waive all or any rights under this Agreement or any other Loan Document, but any waiver or indulgence by Lender at any time or from time to time shall not constitute a future waiver of performance or exact performance by Borrowers.

7.7.    <u>Binding Obligation</u>.  This Agreement shall be binding upon the parties hereto and their successors and assigns.

7.8.    <u>Final Agreement</u>.  This Agreement and the Loan Documents contain the final and entire agreement and understanding the parties hereto, and any terms or conditions not set forth in this Agreement or the Loan Documents are not a part of this Agreement and the understanding the parties hereto.

7.9.    <u>Amendment</u>.  This Agreement may only be amended or altered only in writing signed by the party to be bound by the change or alteration.

7.10.    <u>Continuing Obligation of Borrowers</u>.  The terms, conditions, and covenants set forth herein and in the Loan Documents shall survive Closing and shall constitute a continuing obligation of Borrowers during the course of the transaction contemplated herein.  The security interests, liens and

other security provided by this Agreement or the other Loan Documents shall remain in effect so long as any Obligation, whether direct or contingent, is outstanding, unpaid or unsatisfied.

7.11.   <u>Choice of Law</u>.   Subject to Section 7.18 below, the laws of the State of Wisconsin (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this Agreement and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this Agreement and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this Agreement or which occurred or were to occur as a direct or indirect result of this Agreement having been executed.

7.12.   <u>Notices</u>. All communications or notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given (a) upon delivery if hand delivered, or (b) upon deposit in the United States mail, postage prepaid, or with a nationally recognized overnight commercial carrier, airbill prepaid, or (c) upon transmission if by facsimile, provided that such transmission is promptly confirmed by hand delivery, mail or courier as provided above, and each such communication or notice shall be addressed as follows, unless and until any party notifies the other in accordance with this Section 7.12 of a change of address:

> If to Borrowers:
>
> Geneva Repair Shop, Inc.
> Attn: Pasquale Roppo
> 901 Raddant Rd.
> Batavia, IL 60515
>
> If to Lender:
>
> Byline Bank
> 13925 W. North Avenue
> Brookfield, WI 53005

7.13.   <u>Joint and Several Obligations</u>.   In the event Borrowers consist of more than one Person, then all liabilities, obligations and undertakings of Borrowers pursuant to this Agreement and each other Loan Document to which Borrowers are a party shall be the joint and several obligations of Borrowers.

7.14.   **WAIVER OF RIGHT TO JURY TRIAL**.   LENDER AND BORROWERS ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS OR WITH RESPECT TO THE TRANSACTION CONTEMPLATED HEREBY AND THEREBY WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES AND, THEREFORE, THE PARTIES AGREE THAT ANY LAWSUIT ARISING OUT OF ANY SUCH CONTROVERSY SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY AND BORROWERS HEREBY WAIVE ALL RIGHTS TO A JURY TRIAL.

7.15.   **TIME OF ESSENCE**.   TIME IS OF THE ESSENCE FOR THE PERFORMANCE BY BORROWERS OF THE OBLIGATIONS SET FORTH IN THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.

7.16.   **SUBMISSION TO JURISDICTION; SERVICE OF PROCESS.**   AS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO THIS AGREEMENT:

other security provided by this Agreement or the other Loan Documents shall remain in effect so long as any Obligation, whether direct or contingent, is outstanding, unpaid or unsatisfied.

7.11.   Choice of Law.   Subject to Section 7.18 below, the laws of the State of Wisconsin (excluding, however, conflict of law principles) shall govern and be applied to determine all issues relating to this Agreement and the rights and obligations of the parties hereto, including the validity, construction, interpretation, and enforceability of this Agreement and its various provisions and the consequences and legal effect of all transactions and events which resulted in the execution of this Agreement or which occurred or were to occur as a direct or indirect result of this Agreement having been executed.

7.12.   Notices. All communications or notices required or permitted by this Agreement shall be in writing and shall be deemed to have been given (a) upon delivery if hand delivered, or (b) upon deposit in the United States mail, postage prepaid, or with a nationally recognized overnight commercial carrier, airbill prepaid, or (c) upon transmission if by facsimile, provided that such transmission is promptly confirmed by hand delivery, mail or courier as provided above, and each such communication or notice shall be addressed as follows, unless and until any party notifies the other in accordance with this Section 7.12 of a change of address:

> If to Borrowers:
>
> Geneva Repair Shop, Inc.
> Attn: Pasquale Roppo
> 901 Raddant Rd.
> Batavia, IL 60515
>
> If to Lender:
>
> Byline Bank
> 13925 W. North Avenue
> Brookfield, WI 53005

7.13.   Joint and Several Obligations.   In the event Borrowers consist of more than one Person, then all liabilities, obligations and undertakings of Borrowers pursuant to this Agreement and each other Loan Document to which Borrowers are a party shall be the joint and several obligations of Borrowers.

7.14.   **WAIVER OF RIGHT TO JURY TRIAL**.   LENDER AND BORROWERS ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS OR WITH RESPECT TO THE TRANSACTION CONTEMPLATED HEREBY AND THEREBY WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES AND, THEREFORE, THE PARTIES AGREE THAT ANY LAWSUIT ARISING OUT OF ANY SUCH CONTROVERSY SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY AND BORROWERS HEREBY WAIVE ALL RIGHTS TO A JURY TRIAL.

7.15.   **TIME OF ESSENCE**. TIME IS OF THE ESSENCE FOR THE PERFORMANCE BY BORROWERS OF THE OBLIGATIONS SET FORTH IN THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.

7.16.   **SUBMISSION TO JURISDICTION; SERVICE OF PROCESS**. AS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO THIS AGREEMENT:

(a)     BORROWERS AGREE THAT ALL ACTIONS OR PROCEEDINGS IN ANY MANNER RELATING TO OR ARISING OUT OF THIS AGREEMENT, THE NOTE OR THE OTHER LOAN DOCUMENTS MAY, AT LENDER'S ELECTION, BE BROUGHT IN COURTS OF THE STATE OF WISCONSIN LOCATED IN MILWAUKEE COUNTY OR THE FEDERAL COURT FOR THE EASTERN DISTRICT OF WISCONSIN AND BORROWERS CONSENT TO THE JURISDICTION OF SUCH COURTS.  EACH BORROWER WAIVES ANY OBJECTION IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH COURT AND ANY RIGHT IT MAY HAVE NOW OR HEREAFTER HAVE TO CLAIM THAT ANY SUCH ACTION OR PROCEEDING IS IN AN INCONVENIENT COURT; and

(b)     Borrowers consent to the service of process in any such action or proceeding by certified mail sent to the address specified in Section 7.12.

7.17.    <u>Counterparts; Headings</u>.  This Agreement may be executed in several counterparts, each of which shall be deemed original, but such counterparts shall together constitute but one and the same agreement.  The table of contents and article and section headings in this Agreement are inserted for convenience of reference only and shall not constitute a part of this Agreement.

7.18.    <u>*SBA Loan*</u>.  *The Loan evidenced by this Agreement was made under a SBA nationwide program which uses tax dollars to assist small business owners.  If the United States is seeking to enforce this Agreement, then under SBA regulations:*

(a)     *when SBA is the holder of the promissory note evidencing the Loan, this Agreement and all documents evidencing or securing the Loan will be construed in accordance with federal law.*

(b)     *Lender or SBA may use local or state procedures for purposes such as filing papers, recording documents, giving notice, foreclosing liens, and other purposes.  By using these procedures, SBA does not waive any federal immunity from local or state control, penalty, tax or liability.  Neither any Borrower nor any Guarantor may claim or assert against SBA any local or state law to deny any obligation of Borrowers or any Guarantor, or defeat any claim of SBA with respect to the Loan or this Agreement.*

*Any clause in this Agreement requiring arbitration is not enforceable when SBA is the holder of the promissory note secured by this Agreement.*

**[Signature Page Follows]**

IN WITNESS WHEREOF, Lender and Borrowers have duly executed this Agreement as of the date first above written.

SPIKE BODY WERKS, INC., an Illinois corporation

By:_____
Name: Pasquale Roppo
Title: President

GENEVA REPAIR SHOP INC., an Illinois corporation

By:_____
Name: Pasquale Roppo
Title: President

BYLINE BANK, an Illinois banking corporation

By:_____
Name:_____
Title:_____

24

# EXHIBIT B



## SBA OIG Complaint S

Your complaint has been successfully saved and reported to the SBA

Your Complaint ID is 202007035jao.

Please save this ID and refer to the SBA OIG Hotline website, https://
our Hotline procedures.

OIG Hotline Telephone Number: 1-800-767-0385

If you provided an email address, you will receive an acknowledgemen