**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SPIKE BODY WERKS, | ) | |
| GENEVA REPAIR SHOP, INC., | ) | |
| NICNAT LLC, and | ) | |
| PASQUALE ROPPO, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20-cv-4771 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| BYLINE BANKCORP, INC. and | ) | |
| BYLINE BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2003, Pasquale Roppo emigrated from Italy, and he later opened a body shop. He had big plans, and he needed money to bring them to reality. In 2017, his companies – Spike Body Werks, Geneva Repair Shop, and NICNAT LLC – borrowed more than $3,000,000 through two loans from Defendant Byline Bank.

Things didn't go according to plan. A year and a half later, Roppo and his companies entered into a forbearance agreement with the bank. And he didn't do so willingly. According to the complaint, the bank threatened to declare the loans in default if he did not sign the documents on the spot, without a lawyer. And worse yet, the bank allegedly took advantage of him as an Italian immigrant with limited English proficiency.

The bank later filed a state court complaint to foreclose on the loans. And in response, Roppo and his companies filed this lawsuit. They claim that the bank discriminated against him based on his race and national origin in violation of the Equal Credit Opportunity Act. They bring an assortment of state law claims, too.

The bank moved to dismiss. For the reasons explained below, the motion to dismiss is granted in part and denied in part.

## Factual Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In 2003, Pasquale Roppo emigrated from Italy to the United States. *See* Cplt., at ¶ 10 (Dckt. No. 1). His first language, naturally enough, is Italian. *Id.* He laid down roots in this country, and eventually started his own business in 2010. *Id.* He runs a body shop. *Id.* at ¶ 13.

By 2017, Roppo needed more money to run his business, so he turned to Byline Bank. He began negotiating for an SBA loan in February 2017. *Id.* at ¶ 9. Negotiations lasted 10 months. *Id.*

According to the complaint, one of the key points was the availability of a line of credit. Roppo "made BYLINE abundantly aware that such line of credit would be the only way in which Plaintiffs would be able to sustain its day-to-day operations and survive as a body shop." *Id.* at ¶ 13. He viewed the future availability of a line of credit as a "condition precedent" to closing. *Id.* at ¶ 12.

Roppo also expressed concern about over-collateralization, meaning that the bank was requiring too much collateral to back up its loans to his businesses. *Id.* at ¶¶ 14–15. Roppo voiced dismay that the bank was requiring "everything he owned," meaning "everything 'including his first born,'" as collateral. *Id.* at ¶ 15.

2

But Byline Bank told him not to worry.  During "the negotiation process," Byline "assured Plaintiffs, both verbally and in writing, that it would either issue a line of credit or release some collateral upon Plaintiffs remaining in good standing on the loan for several months following closing on December 29, 2017."  *Id.* at ¶ 17.

Along the way, Roppo told the bank's representatives about his personal story.  He shared "specific facts of his immigration to the United States from Italy on December 13, 2003," including that Italian is his first language.  *Id.* at ¶ 10.  The complaint does not reveal exactly how well Roppo speaks English.  But it does say that Roppo has a "language barrier."  *Id.* at ¶ 11.

By the end of the year, they reached a deal.  On December 29, 2017, Byline Bank agreed to loan over $3 million to his three companies:  Spike Body Werks, Inc., Geneva Repair Shop Inc., and NICNAT LLC.  *Id.* at ¶ 11; Note 1 (Dckt. No. 7, at 76 of 184); Note 2 (Dckt. No. 7, at 138 of 184).  Pasquale Roppo controls all three companies, and signed on their behalf.  *See* Note 1, at 6 of 6; Note 2, at 6 of 6.

The bank made two SBA loans.  Byline Bank entered into a note with Spike Body Werks, Geneva Repair Shop, and NICNAT for $2,706,600.  *See* Note 1 (Dckt. No. 7, at 76 of 184).  Byline Bank also entered into a second note with Spike Body Werks and Geneva Repair Shop (they apparently are the operating companies) for $324,000.  *See* Note 2 (Dckt. No. 7, at 138 of 184).[1]  Pasquale Roppo personally guaranteed the notes.  *See* Unconditional Guarantee 1 (Dckt. No. 7, at 101 of 184); Unconditional Guarantee 2 (Dckt. No. 7, at 144 of 184); *see also*

---

[1]  Plaintiffs purported to attach "[t]rue and correct copies of the relevant loan documents" as Exhibit A to the complaint.  *See* Cplt., at ¶ 9 (Dckt. No. 1).  But Plaintiffs attached an undated, unsigned copy of the Loan Agreement for the $324,000 loan (only).  *See* Loan Agreement (Dckt. No. 1, at 17 of 44).  So the Court is citing copies of the documents proffered by Defendants.

Unconditional Guarantee 3 (Dckt. No. 7, at 149 of 184) (a personal guaranty by NICNAT of the $324,000 note to the other entities).

Byline Bank entered into two mortgage loan agreements with NICNAT LLC – the first for $2,706,600, and the second for $324,000. *See* Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Mortgage Agreement 1") (Dckt. No. 7, at 46 of 184); *see also* Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Mortgage Agreement 2") (Dckt. No. 7, at 108 of 184). The bank entered into various security agreements, too. *See* Security Agreement 1 (Dckt. No. 7, at 154 of 184); Security Agreement 2 (Dckt. No. 7, at 159 of 184); Security Agreement 3 (Dckt. No. 7, at 164 of 184).

After closing, things didn't go as Roppo had expected. In the year that followed, his companies made timely loan payments and remained in good standing on the loans. *See* Cplt., at ¶ 18 (Dckt. No. 1). But for whatever reason, Byline refused to extend the line of credit. *Id.* at ¶ 19. The loss of funds hurt the businesses. Without the line of credit, the body shop "could not even schedule vehicles for repair." *Id.* at ¶ 20.

By early 2019, Roppo sought help from Byline's SBA loan assistance program. *Id.* at ¶ 21. Byline gave the businesses a forbearance on the loans, but it was contingent on Roppo signing new agreements. *Id.* at ¶ 22. Roppo asked to see a copy of the documents so that he could share them with his lawyer, but the bank failed to send him anything. *Id.* at ¶ 23.

Instead, a representative from the bank showed up unannounced at his body shop in June 2019. *Id.* at ¶ 24. The bank's representative demanded that Roppo sign the loan documents then and there, "on the spot," or else the bank would declare his companies in default. *Id.*

According to the complaint, the bank "coerced, and otherwise deceptively induced ROPPO into signing what he called a 'Pocket Deal' (i.e. Deed in Lieu of Foreclosure) to avoid a

4

default." *Id.* at ¶ 25. "Specifically, on said date and time, BYLINE, through its agent Greg Andrews, threatened ROPPO and stated that if he did not sign the Deed immediately while Greg Andrews was present at ROPPO's shop, that BYLINE would immediately default Plaintiffs, and 'take away everything' that ROPPO had worked so hard to build." *Id.* at ¶ 26.

Roppo apparently felt cornered, and asked to speak with his attorney. *Id.* at ¶ 27. But the bank refused. *Id.* Roppo "had no knowledge as to what he was signing, never received copies of the document(s) he signed, and was never given an opportunity to have his attorney review any of the documents before signing, despite his pleas with BYLINE to do so." *Id.* at ¶ 28.

So Roppo signed. He entered into a loan forbearance agreement with the bank on behalf of his companies on June 14, 2019. *See* Forbearance, Loan Modification, and Deed in Lieu of Foreclosure Agreement (Dckt. No. 7, at 82 of 184).

The complaint alleges that he "later discovered that BYLINE had also charged Plaintiffs higher fees and costs . . . ." *See* Cplt., at ¶ 29 (Dckt. No. 1). The bank did so, Plaintiffs allege, not based on "creditworthiness or other objective criteria related to borrower risk." *Id.* Instead, the bank increased the fees and costs because of his "race, and for better lack [sic] of word, 'ignorance' as to terms and conditions due to language barrier." *Id.*

Overall, Roppo and his companies allege that Byline engaged in "discriminatory retail pricing practices." *Id.* at ¶ 31. As a result, his companies "paid significantly more for their loan and were significantly overleveraged and overcollateralized." *Id.*

From Roppo's perspective, things then went from bad to worse. About a year later, on July 1, 2020, the bank filed a complaint against him and his businesses in state court, seeking to foreclose on the loans. *See* Verified Cplt. (Dckt. No. 7, at 18 of 184). The bank alleged that the amount due on the first note was more than $2.8 million, including $2,664,535 in principal and

$215,507 in interest. *Id.* at ¶ 5.j ("As of May 29, 2020, the unpaid principal balance due under the First Note is $2,664,535.34 and the unpaid interest balance is $215,507.88 . . . ."); *see also id.* at ¶ 18 ("[T]he balance due BYLINE by SPIKE on the First Note is $2,916,089.80 as of May 29, 2020  . . . .").[2]

Roppo responded by filing this lawsuit about a month and a half later. *See* Cplt. (Dckt. No. 1). The complaint includes four claims by Roppo and his three companies. Count I is a claim under a federal statute, the Equal Credit Opportunity Act. They allege that the bank discriminated against them on the basis of Roppo's race and national origin.

The next three Counts are state law claims. Count II is a claim for breach of contract and breach of the implied covenant of good faith. Count III is a claim of fraudulent inducement. And Count IV is a claim for fraudulent concealment and fraudulent misrepresentation.

When it comes to remedies, Plaintiffs seek damages (only). They do not seek injunctive relief, and do not seek to void any of the agreements.

Defendants Byline Bancorp and Byline Bank (collectively, "the bank") moved to dismiss. They argue that the complaint fails to state a claim for which relief can be granted. And they argue that this Court should abstain from exercising jurisdiction under the *Colorado River* doctrine in light of the pending state court foreclosure case.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See*

---

[2] The math does not seem consistent. $2,664,535.34 plus $215,507.88 is $2,880,043.22. But a later paragraph alleges that the amount due on the same date totaled $2,916,089.80.

*AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

## Discussion

### I.     The Equal Credit Opportunity Act

The first claim is a discrimination claim under a federal statute, the Equal Credit Opportunity Act. *See* 15 U.S.C. § 1691 *et seq.* Plaintiffs allege that the bank discriminated against them on the basis of race and national origin.

The bank makes two basic arguments. First, the bank argues that Roppo was not an "applicant" within the meaning of the statute. *See* 15 U.S.C. § 1691(a) ("It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin . . . ."). The bank points out that the companies, not Roppo, applied for the loans. *See* Defs.' Mem. in Support of Defs.' Mtn. to Dismiss, at 6–7 (Dckt. No. 7).

The bank seems to drive a wedge between Roppo and his companies. The argument appears to be that the companies can't bring a claim because they don't have a race or a national

origin, and Roppo can't bring a claim because he isn't the borrower on the loans. *Id.* at 7

("Plaintiffs allege that Roppo is an Italian-American immigrant . . . . However, it was the

Plaintiff entities Spike, Geneva and Nicnat that applied for and received the SBA loans."); *see*

*also* Defs.' Reply in Support of Defs.' Mtn. to Dismiss, at 4–5 (Dckt. No. 18) ("It was the

Plaintiff entities and not Roppo who applied for and received the loans at issue.").

The text of the statute sinks that argument. Congress closed that loophole. The statute

defines an "applicant" as "any person who applies to a creditor directly for an extension,

renewal, or continuation of credit . . . ." *See* 15 U.S.C. § 1691a(b). The word "person," in turn,

"means a natural person, a corporation, government or governmental subdivision or agency,

trust, estate, partnership, cooperative, or association." *See* 15 U.S.C. § 1691a(f). A corporation

does not have a race, and neither does a government, or a trust, and so on. But the statute covers

them anyway.

Based on the plain language of the statute, Congress banned discrimination against

companies based on race and national origin, even though companies themselves do not have a

race or a national origin. The text reflects common sense. A bank that discriminates against a

company, based on the race of the company's management, has discriminated against the

company on the basis of race.

It is true that the bank made the loans to the companies, not to Roppo personally. But he

guaranteed the loans, and thus falls within the protections of the statute. *See Estate of Davis v.*

*Wells Fargo Bank*, 633 F.3d 529, 538 (7th Cir. 2011); *FirstMerit Bank, N.A. v. Ferrari*, 71 F.

Supp. 3d 751, 758–59 (N.D. Ill. 2014); *see also* 12 C.F.R. § 202.2(e) (defining the term

"applicant" to include "any person who requests or who has received an extension of credit from

a creditor," as well as "any person who is or may become contractually liable regarding an extension of credit").

Or, at the very least, the bank has not squarely argued that a guarantor is not an "applicant" within the meaning of the statute. In *Moran Foods, Inc. v. Mid-Atlantic Market Development Co.*, 476 F.3d 436, 441 (7th Cir. 2007), the Seventh Circuit expressed "doubt" that the "statute can be stretched far enough to allow this interpretation," meaning the interpretation in the regulation that "applicant" includes guarantors. But as Judge Feinerman has noted, the Seventh Circuit relied on that very regulation four years later in *Estate of Davis*. *See FirstMerit Bank*, 71 F. Supp. 3d at 758–59.

Maybe it is a live issue whether a guarantor is an applicant, but it is not a live issue here and now. The bank has not argued that a guarantor is not an "applicant," so for now, the argument is waived. *Id.* at 759; *see also G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted). "Our system of justice is adversarial, and our judges are busy people." *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (citation omitted).

And in any event, Roppo signed on behalf of each of the companies, and the bank does not explain why that personal involvement does not suffice. The money may not have gone to Roppo personally, but Roppo is the only human being who acted on behalf of the entities. Roppo's companies did not apply for anything without Roppo. He's the one who asked for the money.

Second, the bank argues that the complaint does not contain enough details to state a plausible claim. The complaint does contain enough detail for the claim about national origin discrimination. Roppo alleges that he told two representatives from the bank that he was an immigrant from Italy. *See* Cplt., at ¶ 10 (Dckt. 1). The complaint identifies the individuals by name, and gives a general timeframe (*i.e.*, before closing in December 2017). *Id.* He "verbally discussed his background with them," and shared "specific facts of his immigration." *Id.* He let them know that Italian was his "first language," too. *Id.* The complaint later alleges that the bank took advantage of his lack of English proficiency. *Id.* at ¶¶ 4, 11, 40 of Count I.[3]

Those allegations contain enough facts to state a claim that the bank discriminated against him based on national origin, by taking advantage of the fact that he was from another country. The complaint does not rest on conclusions and generalities, but rather provides details that add substance to the claim.

There is another issue, which the parties do not address. For now, the Court assumes (without deciding) that exploiting language deficiencies of an immigrant can constitute national origin discrimination. The Seventh Circuit does not appear to have resolved that issue. *See Kikumura v. Turner*, 28 F.3d 592, 599 (7th Cir. 1994) ("Whether classifications on the basis of language are to be treated as classifications on the basis of national origin is an unsettled question."); *see also Odisho v. U.S. Bancorp, Inc.*, 2019 WL 3318180, at *7 (N.D. Ill. 2019) ("It is true that language ability *per se* is not the legal equivalent to a protected class like race or national origin, but language can sometimes serve as a proxy, or stalking horse, for discrimination against a protected class.") (quoting *EEOC v. Wisconsin Plastics, Inc.*, 186 F.

---

[3] The complaint repeats the same numbers when numbering the paragraphs. The facts appear in paragraphs 1 to 36. Count I runs from paragraph 37 to 40. But instead of starting with paragraph 41, Count II reuses #37. So Count I has a paragraph 37, and so does Count II, and so do Counts III and IV.

Supp. 3d 945, 948 (E.D. Wis. 2016)); *H.P. v. Bd. of Educ. of City of Chicago*, 385 F. Supp. 3d 623, 638 n.8 (N.D. Ill. 2019) ("The CPS Defendants argue in reply that language-based discrimination does not equate to national origin discrimination. But the Seventh Circuit has not taken a definitive stance on the issue, noting instead that the question is unsettled . . . .") (cleaned up).

The bank has not argued that exploiting someone based on a language deficiency does not constitute discrimination based on national origin. So, for now, it is waived. On a motion to dismiss, the movant's burden is to present arguments for dismissal. The bank has not argued that taking advantage of someone based on a language barrier is not discrimination under the Act, let alone provided supporting case law. So on that score, the Court will leave the complaint as it finds it, and allow the claim to go forward.

But the complaint does not include enough facts to state a claim for race discrimination. Roppo alleges that he is from Italy, but he does not expressly allege his race. But it depends on whether Italian is a race within the meaning of the statute.

The line between race discrimination and national origin discrimination is not always the brightest. *See, e.g.*, *Salas v. Wisconsin Dep't of Corr.*, 493 F.3d 913, 923 (7th Cir. 2007). For now, the Court assumes (without deciding) that Italian qualifies as a race. *See Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006) (noting that "many groups whom we would now label 'white' – Germans, Greeks, Swedes, Hungarians, Finns etc. – were, at the time Congress adopted § 1981, considered distinct races"); *Bisciglia v. Kenosha Unified Sch. Dist. No. 1*, 45 F.3d 223, 230 (7th Cir. 1995) ("[T]he Supreme Court's historical research suggests that 'Italians' may have been considered an identifiable 'race.'"); *see also Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987) ("Based on the history of § 1981, we have little trouble in

11

concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.").

The complaint suffers from a different problem. The complaint includes facts suggesting that the bank took advantage of Roppo because he was an immigrant and not a native speaker. That allegation involves his national origin. But the complaint does not include any facts suggesting that the bank treated him differently because of his race, as opposed to the lack of his language proficiency.

For example, the complaint does not allege that the bankers held an animus against people from Italy. The complaint does not claim that the representatives made slurs or other hostile remarks about Italians, or otherwise disparaged his background in any way. There's no allegation that the bankers disliked that group of people, or had a practice of treating Italians differently than everyone else.

The point is not that the complaint needed to contain allegations about racial slurs to survive. But the complaint did need to include something more than a bare conclusion. And here, the complaint includes the conclusory allegation that the bankers discriminated against him on the basis of race, and not much else. "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusion' or 'a formulaic recitation of the elements of a cause of action will not do.'" *See Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555); *see also Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020).

12

Maybe Plaintiffs can provide facts to support the assertion that the bank discriminated against them on the basis of race. This Court will give Plaintiffs that opportunity. But for now, the complaint does not allege enough to state a plausible claim of race discrimination. If Plaintiffs are simply alleging that Roppo is from Italy and isn't a native speaker, then the claim about his national origin already covers that ground.

The motion to dismiss Count I is denied, with one exception. The claim of race discrimination is dismissed without prejudice. But the Court gives Plaintiffs leave to amend.

## II. The State Law Claims

In addition to the federal claim, Roppo and his companies advance three state law claims. Count II alleges breach of contract and breach of the implied covenant of good faith. Count III is a claim of fraudulent inducement. And Count IV is about fraudulent concealment and fraudulent misrepresentation. The claims share a common thread: Plaintiffs allege that the bank didn't do what it promised to do during negotiations.

Roppo and his companies allege that Byline Bank promised a line of credit, but never carried through. *See* Cplt., at ¶ 39 of Count II (Dckt. No. 1) (alleging that the bank failed to act in good faith by "falsely promising them a line of credit"); *id.* at ¶ 37 of Count III (alleging fraudulent inducement by "promising a line of credit"); *id.* at ¶ 37 of Count IV (alleging that the bank concealed that it was "never going to issue a line of credit"). They also claim that the bank broke its promise to reduce the amount of collateral. *Id.* at ¶ 39 of Count II; *id.* at ¶ 37 of Count IV. In sum, Plaintiffs allege that the bank did not carry through with what it agreed to do before the parties signed the loan agreements.

Those claims cannot survive. The Illinois Credit Agreements Act requires a "writing" that memorializes any agreement reached between the creditor and the debtor. *See* 815 ILCS

160/2.  "A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."  *Id.*

The text of the statute sweeps broadly, and bars any claim about unwritten agreements. "There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement."  *First Nat'l Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 204 Ill. Dec. 676, 642 N.E.2d 138, 142 (1994); *see also Help at Home, Inc. v. Med. Cap., LLC*, 260 F.3d 748, 754 (7th Cir. 2001) ("The ICAA's writing requirement is a strong form of the statute of frauds.").

Illinois courts have not shied away from enforcing the statute as written.  "Illinois courts have emphasized repeatedly that the ICAA is a broad statute that will be applied the way it was written, even though the results of that application may at times seem harsh."  *Help at Home*, 260 F.3d at 755; *Mach. Transps. of Illinois v. Morton Cmty. Bank*, 293 Ill. App. 3d 207, 227 Ill. Dec. 283, 687 N.E.2d 533, 535–36 (1997) (applying the statute as written despite an "acute awareness that strict application of this statute can easily lead to disastrous consequences in the hands of unscrupulous lenders").  "[E]nforcing the Act as written causes harsh results for bank customers in some circumstances, but the Act is very broadly worded and dictates such a result."  *McAloon v. Nw. Bancorp, Inc.*, 274 Ill. App. 3d 758, 211 Ill. Dec. 281, 654 N.E.2d 1091, 1095–96 (1995). "Bank customers do make oral agreements with their banks.  Most often these agreements are honored by the banks and no problem results.  However, if a bank for some reason chooses not to honor the agreement, the customer has no recourse in the law."  *First Nat'l Bank in Staunton*, 642 N.E.2d at 142.

14

The claims at issue fall squarely within the statute. Plaintiffs allege that the bank promised to extend additional money (a line of credit) and reduce the amount of collateral required to support the loans. Those claims are "related to a credit agreement," so they cannot survive unless the agreement is in writing. *See* 815 ILCS 160/2.

The complaint alleges that the bank made promises "both verbally and in writing." *See* Cplt., at ¶ 17 (Dckt. No. 1). Under the Illinois Credit Agreements Act, an agreement must be "in writing," so a debtor cannot bring a claim based on a verbal agreement about the extension of credit. *See* 815 ILCS 160/2; *see also Ministries v. Seaway Bank and Tr. Co.*, 2016 WL 890775, at *3 (N.D. Ill. 2016) ("A verbal modification of an existing credit agreement, therefore, does not satisfy the requirements of section two of the ICAA."). Any oral promises made by Byline Bank to Roppo cannot give rise to a claim.

Plaintiffs allege fraudulent misrepresentation and fraudulent inducement, but it makes no difference. Under the statute, there is no exception for fraud. *See Harris N.A. v. Hershey*, 711 F.3d 794, 800 (7th Cir. 2013) (rejecting a defense of fraudulent inducement in light of the text of the Act); *Whirlpool Fin. Corp. v. Sevaux*, 96 F.3d 216, 225–26 (7th Cir. 1996) (holding that the Credit Agreements Act barred a defense of fraudulent inducement); *see also In re Settlers' Hous. Serv., Inc.*, 514 B.R. 258, 283 (Bankr. N.D. Ill. 2014) ("An allegedly fraudulent misrepresentation has been held to be within the scope of what is barred by the CAA."); *VR Holdings, Inc. v. LaSalle Bus. Credit, Inc.*, 2002 WL 356515, at *3 (N.D. Ill. 2002); *Westinghouse Elec. Corp. v. McLean*, 938 F. Supp. 487, 492 (N.D. Ill. 1996).

Plaintiffs argue that "all of the promises" made by the bank "are memorialized in writings," including "email correspondence." *See* Pls.' Resp. to Defs.' Mtn. to Dismiss, at 16 (Dckt. No. 14). But from a pleading standpoint, the emails are a bit of a black box. Plaintiffs did

not attach the emails to their complaint, or submit them in response to the motion to dismiss. In fact, Plaintiffs didn't even mention the emails in the complaint, let alone describe their contents.

As a general matter, emails can qualify as a "writing" and thus satisfy the terms of the statute. *See* 815 ILCS 160/2. But it depends on what the emails say. Like any other writing, emails must contain all requisite information to comply with the terms of the statute. *See FirstMerit Bank, N.A. v. Donlin Builders, Inc.*, 2015 WL 1165912, at *4 (N.D. Ill. 2015); *Van Pelt Constr. Co. v. BMO Harris Bank, N.A.*, 2014 IL App (1st) 121661, 380 Ill. Dec. 384, 8 N.E.3d 554, 563–64 (2014). Those terms include who the parties are, and what they're agreeing to do. And in particular, the writing must include deadlines for the parties to fulfill their obligations. *See Van Pelt*, 8 N.E.3d at 564. Open-ended aspirations are not enough.

The statute requires the writing to be "signed by the creditor and the debtor." *See* 815 ILCS 160/2. But when it comes to emails, the sender's name can satisfy that requirement. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) (holding that the sender's name on an email satisfies signature requirements under the Uniform Commercial Code).

Here, the complaint does not include any allegation about the content of the emails. One paragraph of the complaint alleges that "Plaintiffs, both verbally and in writing, expressed its concerns to BYLINE that a line of credit was a condition precedent for Plaintiffs to close on the loans." *See* Cplt., at ¶ 12 (Dckt. No. 1). That allegation cannot support a claim. There is a big difference between a borrower's needs, and a creditor's commitments. Telling a bank what you need isn't the same thing as the bank agreeing to provide it.

Another paragraph of the complaint describes what the bank's representative said. The bank "reassured ROPPO time and time again that everything would be 'okay.'" *Id.* at ¶ 16. In particular, Thomas Lyons (the banker) told Roppo that "they were 'going to take care of each

16

other,' and 'not to worry because BYLINE was very familiar with the body shop industry' and that he was 'kind of a big deal in the SBA world' and that he was going to 'make the numbers work to close the loan.'" *Id.*

None of those statements can support a claim. The phraseology suggests that Lyons made those statements orally, not in writing. But even if the bank put those statements in an email, it would not make a difference. Those statements are amorphous aspirations, not concrete promises to do this or that by a specific deadline.

The complaint also alleges that "BYLINE assured Plaintiff, both verbally and in writing, that it would either issue a line of credit or release some collateral upon Plaintiffs remaining in good standing on the loan for several months following closing on December 29, 2017." *Id.* at ¶ 17.

That allegation is closer to the mark, but it does not hit it. The complaint does not reveal what, exactly, the bank agreed to do. Extending an unspecified line of credit, and releasing "some" collateral, is pretty up in the air.

And even then, there is no apparent deadline. It alleges that the bank would issue a line of credit and release collateral at an unspecified time, if Plaintiffs remained in good standing "for several months." *Id.* The phrase "several months" does not give Byline Bank or the borrowers a deadline to fulfill their obligations. And without a deadline, a document cannot satisfy the statute. *See Van Pelt*, 8 N.E.3d at 564. A deadline is one of the "terms and conditions" required by the statute. *See* 815 ILCS 160/2.

Everything is unknown – the amount of the line of credit, the amount of the collateral, the time when Byline Bank would act, and the deadline for Plaintiffs to perform. That statement, even if made in writing, is too open-ended to constitute a written agreement about credit. When

it comes to credit agreements, the amount of money and the timing of performance are basic terms. But the complaint does not mention either.

Maybe Plaintiffs did receive emails from the bank that included agreements to provide a line of credit by a certain period, or an agreement to reduce the collateral by a date certain. But the complaint alleges no such thing. The Court will give Plaintiffs an opportunity to amend the complaint. That way, Plaintiffs will have a chance to include more allegations about the content of any written agreements that they may (or may not) have reached with the bank by email. If the emails exist, and satisfy the statute, it should be simple to provide more details in an amended complaint. *See A.H. Emp. Co. v. Fifth Third Bank*, 2012 WL 686704, at *11 (N.D. Ill. 2012) (dismissing a claim based on emails when the complaint did not allege that the content of the emails satisfied the statute).

Counts II, III, and IV are hereby dismissed without prejudice.

## III.  Abstention

The last argument is about abstention. The bank argues that this Court should put this case on ice and defer to the pending state court litigation. That case, the bank argues, involves the same parties litigating about the same set of loans, so this Court should sit tight and hold off.

The *Colorado River* doctrine "allows courts to conserve judicial resources by abstaining from accepting jurisdiction when there is a parallel proceeding" in state court. *Baek v. Clausen*, 886 F.3d 652, 663 (7th Cir. 2018) (cleaned up). In *Colorado River*, the Supreme Court cautioned that the doctrine is the exception, not the rule. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976). Federal courts have a "virtually unflagging obligation to exercise the jurisdiction given them" and abstention is appropriate "only

in exceptional circumstances." *Id.* at 813; *see also AXA Corp. Sols. v. Underwriters Reinsurance Corp.*, 347 F.3d 272, 278 (7th Cir. 2003).

But sometimes abstention is appropriate. Courts must consider issues about "'[w]ise judicial administration,'" including the need for "'conservation of judicial resources and comprehensive disposition of litigation.'" *Colorado River*, 424 U.S. at 817 (alterations in original) (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)).

When deciding whether to abstain, a district court's task is "not to find some substantial reason for the exercise of federal jurisdiction . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983) (cleaned up). Instead, "the task is to ascertain whether there exist exceptional circumstances, the clearest of justifications, that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Id.* at 25–26.

An analysis under *Colorado River* has two steps. First, the Court asks "whether the state and federal court actions are parallel." *Baek*, 886 F.3d at 663 (quoting *Freed v. J.P. Morgan Chase Bank, N.A.*, 756 F.3d 1013, 1018 (7th Cir. 2014)). Two suits are parallel if the same parties are contemporaneously litigating substantially the same issues. *See Adkins v. VIM Recycling, Inc.*, 644 F.3d 483, 498 (7th Cir. 2011). "Precisely formal symmetry is unnecessary." *Id.* at 499. Instead, the primary question is "whether there is a 'substantial likelihood that the state litigation will dispose of all claims presented in the federal case.'" *Id.* (quoting *Tyrer*, 456 F.3d at 751). If in doubt, courts err on the side of exercising jurisdiction. *Id.*

"If the actions are not parallel, the Colorado River doctrine does not apply and the court need not address the second part of the analysis." *Freed*, 756 F.3d at 1018 (citing *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1287 (7th Cir. 1988)). If the proceedings are parallel, a district court must proceed to step two.

The second step involves weighing 10 non-exclusive factors to determine if abstention is proper. *Id.* These factors include: "(1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim." *Baek*, 886 F.3d at 663–64 (quoting *Freed*, 756 F.3d at 1018). No one factor is necessarily determinative, and a court must carefully consider both the obligation to exercise jurisdiction and the factors counselling against that exercise. *See Colorado River*, 424 U.S. at 818–19.

Here, the state case and the federal case are not parallel within the meaning of *Colorado River*. To be sure, there is a lot of overlap. The cases involve the same parties, and they're about the same set of loans.

But the existence of overlap, even substantial overlap, is not enough. The "critical question" is whether there is a "substantial likelihood that the state litigation will dispose of *all* claims presented in the federal case." *See Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 646 (7th Cir. 2011) (emphasis added); *see also Adkins*, 644 F.3d at 498. And that's where the cases go in different directions.

This case, unlike the state case, includes a federal discrimination claim. That claim opens the door to a whole set of issues not covered by a foreclosure action. The issue in this case is how the bank treated Roppo before contract formation, not what rights the parties have after contract formation. So, the state case may determine the bank's rights under the agreements, but

it will not resolve whether the bank discriminated against Roppo and his companies in the first place. *See Huon*, 657 F.3d at 646 (finding that a state case with a defamation claim was not parallel to a federal case with a discrimination claim); *cf. Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 647–48 (7th Cir. 2021) (concluding that a state case and a federal case were parallel because they shared a core dispute about foreclosure, and both cases involved "nearly identical allegations of fraud"); *Karol v. Old Second Nat'l Bank*, 2020 WL 6343088, at *3–5 (N.D. Ill. 2020) (finding parallel suits when a state foreclosure action and federal action both involved breach of contract questions).

Importantly, it is not the addition of a federal cause of action that makes the actions not parallel. *See Karol*, 2020 WL 6343088, at *3; *see also Loughran*, 2 F.4th 648–49. The legal theories are not dispositive. What matters is the likelihood that the state foreclosure action will dispose of Spike's discrimination claim. And here, the foreclosure case will focus on the terms of the deal, not how the parties arrived at the deal. Without the federal case, the backstory about contract formation would remain untold, and unlitigated.

The claims are different, and the evidence will be different, too. "One important factor is whether both cases would be resolved by examining largely the same evidence." *See Huon*, 657 F.3d at 647. Evidence in a foreclosure case is different than evidence in a discrimination case. *See id.* (finding that two cases were not parallel because the evidence needed to establish a discrimination claim is broader than that needed to establish a state defamation claim).

The state court case and this federal case are not parallel, so there is no need for abstention under *Colorado River*. Step one does not favor abstention, so there is no need for this Court to march through the 10 factors under step two. *See Freed*, 756 F.3d at 1018.

**Conclusion**

For the reasons stated above, the motion to dismiss is granted in part and denied in part.

The motion to dismiss the claim under the Equal Credit Opportunity Act is denied for the claim

about discrimination based on national origin, and is granted for the claim about discrimination

based on race. The motion to dismiss the state law claims is granted. The Court grants Plaintiff

leave to file an amended complaint by September 10, 2021.


Date:   August 27, 2021                         _____

                                                Steven C. Seeger
                                                United States District Judge