# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SPIKE BODY WERKS, ) <br> GENEVA REPAIR SHOP, INC., ) <br> NICNAT LLC, and ) <br> PASQUALE ROPPO, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> BYLINE BANCORP, INC. and ) <br> BYLINE BANK, ) <br> ) <br> Defendants. ) <br> ) | Case No. 20-cv-4771 <br><br> Hon. Steven C. Seeger |

## MEMORANDUM OPINION AND ORDER

Pasquale Roppo is an Italian immigrant and body shop owner. In 2017, Roppo had big plans for his business, so his companies – Spike Body Werks, Geneva Repair Shop, and NICNAT LLC – borrowed more than $3 million from Defendant Byline Bank.

Things didn't go according to plan. In late 2019, Roppo and his companies entered into a forbearance agreement with the bank. According to Roppo, the bank threatened to declare the loans in default if he did not sign the documents on the spot, without a lawyer. And worse, Roppo says that the bank took advantage of him as an Italian immigrant with limited English proficiency.

The bank later filed a state court complaint to foreclose on the loans. In response, Roppo and his companies filed this lawsuit. They claimed that the bank discriminated against him based on his race and national origin in violation of the Equal Credit Opportunity Act. They brought an assortment of state law claims, too.

This Court previously granted in part and denied in part Defendants' motion to dismiss. *See* 8/27/2021 Order (Dckt. No. 19). The Court allowed Roppo's claim about national origin discrimination under the federal Equal Credit Opportunity Act to survive. *Id.* But the Court dismissed Roppo's race discrimination claim under the Equal Credit Opportunity Act, and dismissed his state law claims, too. *Id.*

This Court gave Roppo and his companies an opportunity to amend the complaint, and they later did so. The bank, in turn, filed a motion to dismiss the state law claims for a second time. For the reasons explained below, the motion to dismiss is granted.

**Factual Background**

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In 2003, Pasquale Roppo emigrated from Italy to the United States. *See* Am. Cplt., at ¶ 11 (Dckt. No. 22). His first language is Italian. *Id.* He laid down roots in the United States, and eventually started his own business in 2010. *Id.* Roppo runs a body shop. *Id.* at ¶ 15.

By 2017, Roppo needed more money to run his business, so he turned to Byline Bank. Byline came highly recommended to Roppo from another customer. *Id.* at ¶ 9. He began negotiating for a small business loan ("SBA loan") in February 2017 and negotiations lasted 10 months. *Id*.

One of Roppo's key points in the negotiation was the availability of a line of credit. Roppo "made BYLINE abundantly aware that such line of credit would be the only way in

which Plaintiffs would be able to sustain its day-to-day operations and survive as a body shop." *Id.* at ¶ 15. He viewed the future availability of a line of credit as a "condition precedent" to closing on the loans. *Id.* at ¶ 14. When Roppo met with Byline representative Thomas Lyons in May 2017, he told Lyons that he needed a line of credit covering 10–15% of his revenues, approximately $2 million at the time. *Id.* at ¶ 16. According to Roppo, Lyons agreed on behalf of Byline to provide a $250,000 line of credit as part and parcel of the loan. *Id.* Over the next seven months, the line of credit remained a topic of conversation in Roppo and Byline's email and telephone correspondence. *Id.* at ¶ 18.

Roppo also expressed concern about over-collateralization, meaning that the bank was requiring too much collateral to back up its loans to his businesses. *Id.* at ¶ 19. Roppo voiced dismay that the bank was requiring "everything he owned," meaning "everything 'including his first born,'" as collateral. *Id*.

But Byline told him not to worry. Byline "reassured ROPPO time and time again that everything would be 'okay'" and that "they were going to take care of each other.'" *Id.* at ¶ 20. During "the negotiation process," Byline "assured Plaintiffs, both verbally and in writing, that it would either issue a line of credit or release some collateral upon Plaintiffs remaining in good standing on the loan for several months following closing on December 29, 2017." *Id.* at ¶ 21.

During negotiations, Roppo also told the bank's representatives about his personal story. He shared "specific facts of his immigration to the United States from Italy on December 13, 2003," including that Italian is his first language. *Id.* at ¶ 11. He told Byline at the "first meeting that 'he came to this country [the U.S.] with $300.00 in his pocket and didn't speak any English whatsoever.'" *Id.* at ¶ 11. And Roppo "expressed great concern" about his "deficiencies in English," and he worried that Byline would take advantage of him. *Id.* at ¶ 12. Byline tried to

ease his concerns by telling him that "no one [at Byline] will take advantage of your language." *Id.*

By the end of the year, they reached a deal. On December 29, 2017, Byline Bank agreed to loan over $3 million to his three companies: Spike Body Werks, Inc., Geneva Repair Shop Inc., and NICNAT LLC. *Id.* at ¶¶ 11, 21; Note 1 (Dckt. No. 7, at 76 of 184); Note 2 (Dckt. No. 7, at 138 of 184). Pasquale Roppo controls all three companies, and signed on their behalf. *See* Note 1, at 6 of 6; Note 2, at 6 of 6.

The bank made two SBA loans. Byline Bank entered into a note with Spike Body Werks, Geneva Repair Shop, and NICNAT for $2,706,600. *See* Note 1 (Dckt. No. 7, at 76 of 184). Byline Bank also entered into a second note with Spike Body Werks and Geneva Repair Shop (the operating companies) for $324,000. *See* Note 2 (Dckt. No. 7, at 138 of 184).[1] Roppo personally guaranteed the notes. *See* Unconditional Guarantee 1 (Dckt. No. 7, at 101 of 184); Unconditional Guarantee 2 (Dckt. No. 7, at 144 of 184); *see also* Unconditional Guarantee 3 (Dckt. No. 7, at 149 of 184) (a personal guaranty by NICNAT of the $324,000 note to the other entities).

Byline Bank entered into two mortgage loan agreements with NICNAT LLC – the first for $2,706,600, and the second for $324,000. *See* Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Mortgage Agreement 1") (Dckt. No. 7, at 46 of 184); *see also* Mortgage, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Mortgage Agreement 2") (Dckt. No. 7, at 108 of 184). The bank entered into various security

---

[1] Plaintiffs purported to attach "[t]rue and correct copies of the relevant loan documents" as Exhibit A to the amended complaint. *See* Am. Cplt., at ¶ 9 (Dckt. No. 22). But just as they did in the original complaint, Plaintiffs attached an undated, unsigned copy of the Loan Agreement for the $324,000 loan (only). *See* Loan Agreement (Dckt. No. 22, at 19 of 70). So for background, the Court is citing copies of the documents proffered by Defendants in the first motion to dismiss.

4

agreements, too. *See* Security Agreement 1 (Dckt. No. 7, at 154 of 184); Security Agreement 2 (Dckt. No. 7, at 159 of 184); Security Agreement 3 (Dckt. No. 7, at 164 of 184).

After closing, things didn't go as expected. In the year that followed, Roppo's companies made timely loan payments and remained in good standing on the loans. *See* Am. Cplt., at ¶ 22 (Dckt. No. 22). But Byline refused to extend the line of credit. *Id.* at ¶ 23. Roppo periodically inquired about the line of credit, but every time he asked about it, Byline responded by saying "everything is in-house . . . be a good customer a bit longer and we'll activate the line of credit for you." *Id.* The loss of funds hurt the businesses. Without the line of credit, the body shop "could not even schedule vehicles for repair." *Id.* at ¶ 24.

By early 2019, Roppo sought help from Byline's SBA loan assistance program. *Id.* at ¶ 25. Byline gave the businesses a forbearance on the loans, but it was contingent on Roppo signing certain documents. *Id.* at ¶ 26. Roppo asked to see a copy of the documents so that he could share them with his lawyer, but the bank failed to send him anything. *Id.* at ¶ 27.

Instead, a representative from the bank showed up unannounced at his body shop in June 2019. *Id.* at ¶ 28. The bank's representative demanded that Roppo sign the loan documents then and there, "on the spot," or else the bank would declare his companies in default. *Id.*

The bank "coerced, and otherwise deceptively induced ROPPO into signing what he called a 'Pocket Deal' (i.e. Deed in Lieu of Foreclosure) to avoid a default." *Id.* at ¶ 29. "Specifically, on said date and time, BYLINE, through its agent Greg Andrews, threatened ROPPO and stated that if he did not sign the Deed immediately while Greg Andrews was present at ROPPO's shop, that BYLINE would immediately default Plaintiffs, and 'take away everything' that ROPPO had worked so hard to build." *Id.* at ¶ 30.

5

Roppo felt cornered, and asked to speak with his attorney. *Id.* at ¶ 31. But the bank refused. *Id.* Roppo "had no knowledge as to what he was signing, never received copies of the document(s) he signed, and was never given an opportunity to have his attorney review any of the documents before signing, despite his pleas with BYLINE to do so." *Id.* at ¶ 32.

So Roppo signed. He entered into a loan forbearance agreement with the bank on behalf of his companies on June 14, 2019. *See* Forbearance, Loan Modification, and Deed in Lieu of Foreclosure Agreement (Dckt. No. 7, at 82 of 184).

After signing, another Byline representative, Michael Van Ede, took over Roppo's file. *See* Am. Cplt., at ¶ 33 (Dckt. No. 22). In January 2020, Roppo had a telephone call with Van Ede where Van Ede confronted Roppo, screamed at him, and yelled racial and ethnic slurs at him. *Id.* at ¶ 34. Van Ede told Roppo that "[t]his is the problem with YOU Italian immigrants," "[i]f you do not make your loan payments as you agreed to with BYLINE, I will make you homeless," and "[w]e will take everything from you and will send YOU back to YOUR country." *Id.*

Plaintiffs also allege that he "later discovered that BYLINE had also charged Plaintiffs higher fees and costs . . . ." *Id.* at ¶ 36. The bank did so, Plaintiffs allege, not based on "creditworthiness or other objective criteria related to borrower risk." *Id.* Instead, the bank increased the fees and costs because of his "race, and for better lack [sic] of word, 'ignorance' as to terms and conditions due to language barrier." *Id.*

Overall, Roppo and his companies allege that Byline engaged in "discriminatory retail pricing practices." *Id.* at ¶ 38. As a result, his companies "paid significantly more for their loan and were significantly overleveraged and overcollateralized." *Id.*

6

From Roppo's perspective, things then continued to go downhill. In July 2020, the bank filed a complaint against him and his businesses in state court, seeking to foreclose on the loans. *See* Verified Cplt. (Dckt. No. 7, at 18 of 184).

Roppo and his companies responded by filing this lawsuit. *See* Cplt. (Dckt. No. 1). After this Court ruled on Defendants' motion to dismiss, Roppo filed an amended complaint. *See* Am. Cplt. (Dckt. No. 22). The amended complaint includes four claims. Count I is a claim under a federal statute, the Equal Credit Opportunity Act. *Id.* at ¶ 43. Plaintiffs allege that the bank discriminated against them on the basis of Roppo's race and national origin.[2]

The next three Counts are state law claims. Count II is a claim for breach of contract and breach of the implied covenant of good faith. Count III is a claim of fraudulent inducement. And Count IV is a claim for fraudulent concealment and fraudulent misrepresentation.

Defendants Byline Bancorp and Byline Bank (collectively, "the bank") later moved to dismiss the amended complaint in part. *See* Defs.' Partial Mtn. to Dismiss (Dckt. No. 25). They argue that Counts II–IV (the state law claims) fail to state a claim because they do not allege a written agreement as required by the Illinois Credit Agreements Act.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See*

---

[2] In its prior ruling, this Court dismissed Plaintiffs' race discrimination claim under the Equal Credit Opportunity Act. *See* 8/27/2021 Order, at 13 (Dckt. No. 19). In their amended complaint, Plaintiff once again raise a claim under that Act, and allege discrimination "on the basis for race and national origin." *See* Am. Cplt., at ¶ 43 (Dckt. No. 22). Defendants did not move to dismiss the federal claim, in whole or in part. So, for now, it survives.

*AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

The statute of frauds is typically an affirmative defense. *See* Fed. R. Civ. P. 8(c)(1). Even so, a court can consider the failure to allege a written agreement as required by the Illinois Credit Agreements Act at the motion to dismiss stage. *See, e.g.*, *Help At Home Inc. v. Med. Cap., LLC*, 260 F.3d 748 (2001); *LaSalle Bank Nat'l Assoc. v. Paramont Props.*, 588 F. Supp. 2d 840 (N.D. Ill. 2008) (St. Eve, J.); *Ministries v. Seaway Bank & Tr. Co.*, 2016 WL 890775 (N.D. Ill. 2016) (Kocoras, J.).

**Discussion**

Defendants move to dismiss Plaintiffs' three state law claims. *See* Am. Cplt., at Counts II, III, and IV (Dckt. No. 22). The basic idea is that Plaintiffs have not alleged a breach of a written agreement. The Court agrees.

The state law claims share a common thread: they allege that the bank didn't do what it promised to do during negotiations. Count II alleges a breach of contract and a breach of the

8

implied covenant of good faith. Count III is a claim of fraudulent inducement. And Count IV is about fraudulent concealment and fraudulent misrepresentation.

Specifically, Roppo and his companies allege that Byline Bank promised a line of credit, but never delivered. *Id.* at ¶ 45 of Count II (Dckt. No. 22) (alleging that the bank failed to act in good faith by "falsely promising them a line of credit"); *id.* at ¶ 43 of Count III (alleging fraudulent inducement by "promising a line of credit"); *id.* at ¶ 43 of Count IV (alleging that the bank concealed that it was "never going to issue a line of credit"). And they claim that the bank broke its promise to reduce the amount of collateral. *Id.* at ¶ 45 of Count II; *id.* at ¶ 43 of Count IV. In other words, Plaintiffs allege that the bank did not carry through with its promises to increase credit and decrease credit restrictions.

But when it comes to credit agreements, promises matter only if they are in writing. The Illinois Credit Agreements Act requires a "writing" that memorializes the terms of any agreement between the creditor and the debtor. *See* 815 ILCS 160/2. "A debtor may not maintain an action on or in any way related to a credit agreement unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." *Id.*

The text of the statute is broad, barring any claim about unwritten agreements. It covers a claim "in any way related to a credit agreement." *Id.* "There is no limitation as to the type of actions by a debtor which are barred by the Act, so long as the action is in any way related to a credit agreement." *First Nat'l Bank in Staunton v. McBride Chevrolet, Inc.*, 267 Ill. App. 3d 367, 204 Ill. Dec. 676, 642 N.E.2d 138, 142 (1994); *see also Help At Home, Inc. v. Med. Cap.,*

*LLC*, 260 F.3d 748, 754 (7th Cir. 2001) ("The ICAA's writing requirement is a strong form of the statute of frauds.").

"Illinois courts have emphasized repeatedly that the ICAA is a broad statute that will be applied the way it was written, even though the results of that application may at times seem harsh." *Help At Home*, 260 F.3d at 755; *Mach. Transps. of Illinois v. Morton Cmty. Bank*, 293 Ill. App. 3d 207, 227 Ill. Dec. 283, 687 N.E.2d 533, 535–36 (1997) (applying the statute as written despite an "acute awareness that strict application of this statute can easily lead to disastrous consequences in the hands of unscrupulous lenders"). "[E]nforcing the Act as written causes harsh results for bank customers in some circumstances, but the Act is very broadly worded and dictates such a result." *McAloon v. Nw. Bancorp, Inc.*, 274 Ill. App. 3d 758, 211 Ill. Dec. 281, 654 N.E.2d 1091, 1095–96 (1995). "Bank customers do make oral agreements with their banks. Most often these agreements are honored by the banks and no problem results. However, if a bank for some reason chooses not to honor the agreement, the customer has no recourse in the law." *First Nat'l Bank in Staunton*, 642 N.E.2d at 142.

Here, Plaintiffs' state law claims fall squarely within the statute. Plaintiffs allege that the bank promised to extend additional money – a line of credit – and reduce the amount of collateral required to support the loans. Those claims are "related to a credit agreement," so they cannot survive unless the agreement was in writing. *See* 815 ILCS 160/2.

The original complaint alleged that there was an oral and written agreement. Plaintiffs alleged that the bank promised, "both verbally and in writing," that it would provide more credit or require less collateral. *See* Cplt., at ¶ 17 (Dckt. No. 1); *see also id.* at ¶ 12. And, in response to the first motion to dismiss, Plaintiffs argued that there were supporting emails that memorialized the agreement.

10

Emails can qualify as a "writing" and satisfy the terms of the statute. *See* 815 ILCS 160/2. But the original complaint did not give this Court much to go on, and didn't reveal anything about the content of the emails. In particular, the original complaint did not allege that the emails contained all of the information required under Illinois law.

This Court dismissed the state law claims for failing to satisfy the Illinois Credit Agreements Act. *See* 8/27/2021 Order (Dckt. No. 19). Specifically, the Court ruled that the complaint failed to allege that the bank made promises about the line of credit and collateral in writing, and thus did not allege a claim under the Act. *Id.* at 18. At best, Roppo's original complaint alleged oral agreements (only), and offered vague allusions to a written agreement. *Id.* at 16–18. But this Court left the door open and gave Plaintiffs leave to amend.

Plaintiffs filed an amended complaint, but it does not fill the void and fit the bill. If anything, it is more of the same. Once again, the amended complaint alleges that the bank made promises "both verbally and in writing." *See* Am. Cplt., at ¶ 14 (Dckt. No. 22); *see also id.* at ¶ 21 ("BYLINE assured Plaintiff, both verbally and in writing, that it would either issue a line of credit or release some collateral upon Plaintiffs remaining in good standing on the loan for several months following closing on December 29, 2017.").

The first part of that argument is a non-starter. Again, under the Illinois Credit Agreements Act, an agreement must be "in writing," so a debtor cannot bring a claim based on a verbal agreement about the extension of credit. *See* 815 ILCS 160/2; *see also Ministries v. Seaway Bank & Tr. Co.*, 2016 WL 890775, at *3 (N.D. Ill. 2016) ("A verbal modification of an existing credit agreement, therefore, does not satisfy the requirements of section two of the ICAA."). Any oral promises made by Byline Bank to Roppo cannot give rise to a claim, even if they were *broken* promises.

11

To state a claim, the amended complaint needed to allege that the parties had a written agreement. The amended complaint does include a few paragraphs about the emails, and Plaintiffs attached them as exhibits. *See* Am. Cplt., at ¶ 18 (Dckt. No. 22); Emails (Dckt. No. 22, at 46–68 of 70). Specifically, Plaintiffs allege that "[s]ubsequent to the May 7, 2017 meeting and up through December, 2017, (the closing) email correspondence (and countless telephone calls) were exchanged between ROPPO and BYLINE which memorialized BYLINE's contractual obligations to extend the line of credit it had promised ROPPO." *See* Am. Cplt., at ¶ 18.

Emails can qualify as a "writing" and thus satisfy the terms of the statute. *See* 815 ILCS 160/2. But it depends on what the emails say. Like any other writing, emails must contain all requisite information to comply with the terms of the statute. *See FirstMerit Bank, N.A. v. Donlin Builders, Inc.*, 2015 WL 1165912, at *4 (N.D. Ill. 2015); *Van Pelt Constr. Co. v. BMO Harris Bank, N.A.*, 2014 IL App (1st) 121661, 380 Ill. Dec. 384, 8 N.E.3d 554, 563–64 (2014). Those terms include who the parties are, and what they're agreeing to do. And in particular, the writing must include deadlines for the parties to fulfill their obligations. *See Van Pelt*, 8 N.E.3d at 564. Open-ended aspirations are not enough.

The statute requires the writing to be "signed by the creditor and the debtor." *See* 815 ILCS 160/2. That requirement does not disqualify emails. The sender's name can satisfy the signature requirement. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) (holding that the sender's name on an email satisfies signature requirements under the Uniform Commercial Code). But the statute requires a signature by both parties. Sending an email to a bank isn't enough, because that's a one-sided affair.

In the amended complaint, Plaintiffs allege that the emails memorialized an agreement for a $250,000 line of credit, but a closer look reveals the opposite. *See* Am. Cplt., at ¶ 18 (Dckt. No. 22). When considering a motion to dismiss, the Court generally must accept the complaint's allegations as true. But the Court is free to read the attached documents for itself, and is not bound to accept a plaintiff's characterization of what they say. The Court can form its own conclusions about what the documents say and mean, and what they don't say and mean. *See Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1327 (2d ed. 1990)). "[A] plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 529 (7th Cir. 1999).

Here, the emails do not support Plaintiffs' cause. If anything, they do the opposite. They show that Roppo requested a line of credit and referenced an oral agreement to a line of credit. But the bank never agreed to anything in writing.

During negotiations in July 2017, Roppo emailed Byline about his need for credit. "As you know im [sic] shopping around to open new businesses bank account and I need an operating line of credit for each business to help obtain parts needed for large projects I will have a hard time getting one with all of my assets encumbered. How can we fix this issue?" *See* Emails (Dckt. No. 22, at 46 of 70). Apparently Roppo was concerned that, with an over-collateralized SBA, he wouldn't be able to get a line of credit.

A few days later, Byline responded by describing what it "typically" would do "if" the borrower is a "good customer." "If all [Roppo] needs is a line of credit and all the other bank needs is receivables and inventory for collateral, then we can typically accommodate a request to

13

release our lien on those items if he's otherwise being a good customer. However, it is a credit call after closing." *Id.* at 48.

The July 2017 emails cannot support a claim. They show that Roppo expressed a need for a line of credit, and the bank responded that it "typically" accommodates a "good customer." *Id.* at 46, 48. The bank would need to make a "credit call," and that call would take place "after closing." *Id.* at 48. Byline didn't promise Roppo that it would loan more funds or release more collateral, let alone specify how much, and when.

At best, the email from the bank addressed how the bank might approach a future need. It wasn't a commitment for a future credit arrangement. *See FirstMerit Bank*, 2015 WL 1165912, at *4; *Van Pelt*, 8 N.E.3d at 563–64. It was closer to "we'll cross that bridge when we come to it."

The other emails do not constitute a written agreement, either. In December 2017, around the time of closing, Roppo sent an email asking for an update on when the closing would take place. He expressed frustration about the loss of business as he waited for the loan: "I'm already forced to take less work in due to the absence of lines of credit. This is causing a[n] avalanche effect." *See* Emails (Dckt. No. 22, at 52 of 70).

Notice, Roppo didn't say that the parties had agreed to a line of credit. He simply stated that he needed one. And Roppo didn't attach to the amended complaint any response email from Byline indicating that they agreed to a line of credit. It's a one-sided expression of need.

In May 2019, the line of credit came up again. First, Byline asked Roppo to answer certain questions for an "underwriter working on [Roppo's] deferment request." *Id.* at 54. One question asked about the decrease in the cost of goods sold. *Id.* Roppo responded: "line of credit it [sic] will give us more purchasing power and allow us to schedule more cars in and that

14

will bring more money into the doors." *Id.* That's a request from a borrower for a line of credit. That's not a commitment from a lender to provide a line of credit.

In another May 2019 email, Byline requested financial projections for the body shop. In response, Roppo explained that "there are 2 scenarios that would lead to different projections." *Id.* at 56. One scenario involved "[i]f we are unable to get a line of credit as was discussed at the time of closing with Byline." *Id.* That's not an agreement by the lender to provide a line of credit. It's a prediction by the borrower about what will happen if the lender doesn't provide a line of credit.

In September 2019, Roppo and his attorney exchanged emails with the bank, and the subject line was "collateral release to obtain a line of credit." *Id.* at 57–62. On September 16, 2019, Roppo mentioned a promise by the bank to provide a line of credit. "We have been talking for a while about a partial collateral release or a line of credit for Spike body werks inc. Something that was promised to be made available to me since we closed the loan nearly 2 years ago." *Id.* at 62.

That's not a written agreement. It's a suggestion by the borrower that the lender had made an oral promise. The lender didn't respond and confirm that any such agreement ever existed. And even then, it did not contain all of the terms required by the statute.

Then, on September 17, 2019, Roppo's attorney emailed Byline yet again. *Id.* at 57. He asked Byline for another deferment, or for a line of credit. The phraseology suggested that Roppo had been requesting a line of credit for quite some time: "Can By-Line itself offer the type of revolving line of credit Pasquale has been seeking since closing this SBA Loan, taking into consideration the additional collateral per Pasquale's email below?" *Id.* The lawyer referred to "promises" made by the bank, too: "All of this was known by By-Line at the time he

15

closed the loan, and promises were made to Pasquale that a line of credit would be set up for him." *Id.*

Again, that email referred to promises made by the bank. It did not memorialize an agreement by the bank to provide a loan, let alone specify all of the terms required by the statute. And in response, Byline did not confirm an agreement to provide a line of credit. Quite the opposite – the bank rejected the request for a line of credit outright. *Id.* "Unfortunately if a borrower is past due on their payments, we are not permitted to extend any additional payment." *Id.* So once again Byline rejected Roppo's request.

Finally, the line of credit came up one last time in January 2020. Roppo attached an email that he sent to his attorney for approval before sending it to the bank. *Id.* at 66. Roppo expressed frustration: "I have been asking for over one year to Byline in the person of Tom Lyons and Greg Andrew to release a small portion of collateral to allow me to negotiate a line of credit with another bank. The answer was no, regardless that this was discussed before the closing with Tom Lyons who agreed that a business this size needs a line of credit due to the nature of this industry and told me that after few months being a good paying customer, it would happen." *Id.* Again, that's not a written agreement with the lender. It's an email by the borrower claiming that the lender had promised to give him a line of credit.

In sum, none of the emails can support a claim. Plaintiffs cannot bring a claim "unless the credit agreement is in writing, expresses an agreement or commitment to lend money or extend credit or delay or forbear repayment of money, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." *See* 815 ILCS 160/2. The emails in question do not do the trick. The simple reality is that the bank did not agree to anything in writing.

The emails show that Roppo repeatedly asked for a line of credit, and hoped to get it. They also expressed Roppo's understanding that the bank had orally promised to provide a line of credit. But the bank never agreed to provide a line of credit in any of the emails, so the emails cannot support a claim under the Illinois Credit Agreements Act.

## Conclusion

For the foregoing reasons, the motion to dismiss is granted. Counts II, III, and IV are hereby dismissed.

Date: June 9, 2022

Steven C. Seeger
United States District Judge